No. 23-50016

# IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellant,*

*v.*

NATHAN WILSON AND CHRISTOPHER BEASLEY,
*Defendants-Appellees.*

*APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
DISTRICT COURT NO. CR 20-516-FMO*

## GOVERNMENT'S OPENING BRIEF

E. MARTIN ESTRADA
United States Attorney

BRAM M. ALDEN
Assistant United States Attorney
Chief, Criminal Appeals Section

ALEXANDER P. ROBBINS
Assistant United States Attorney
Deputy Chief, Criminal Appeals
Section

1000 United States Courthouse
312 North Spring Street
Los Angeles, CA 90012
(213) 894-2400
Alexander.P.Robbins@usdoj.gov

Attorneys for Plaintiff-Appellee
UNITED STATES OF AMERICA

# TABLE OF CONTENTS

**DESCRIPTION**                                                    **PAGE**

I. INTRODUCTION ................................................................. 1

II. ISSUE PRESENTED ........................................................ 3

III. STATEMENT OF THE CASE ........................................... 3

    A. Jurisdiction, Timeliness, and Bail Status ............................ 3

    B. Statement of Facts and Procedural History .......................... 4

        1. Defendants Torch a Police Car ..................................... 4

        2. The Attorney General Creates a Task Force on Violent Anti-Government Extremists ......................... 7

        3. The FBI Discovers Defendants' Identities and Their Violent Crimes and Exhortations ...................... 8

    C. Defendants Are Indicted and Make Impossibly Far-Reaching Discovery Demands ............................................ 11

    D. The District Court Grants Defendants' Far-Reaching Discovery Requests in Full ............................................... 15

    E. The District Court Denies Reconsideration and Dismisses the Indictment ................................................. 19

IV. SUMMARY OF ARGUMENT ........................................... 20

V. STANDARD OF REVIEW ............................................... 21

VI. ARGUMENT ................................................................... 22

    A. Selective-Prosecution Claimants Must Demonstrate Both Discriminatory Effect and Discriminatory Intent ....... 22

# TABLE OF CONTENTS (continued)

**DESCRIPTION**                                                     **PAGE**

    B.    Defendants Failed to Demonstrate Discriminatory Effect.................................................................26

    C.    Defendants Failed to Demonstrate Discriminatory Intent.................................................................33

    D.    The District Court Erred by Relying on *United States v. Steele*.................................................................38

VII.  CONCLUSION .................................................................42

# TABLE OF AUTHORITIES

**DESCRIPTION**                                            **PAGE(S)**

## Federal Cases

*Ave. 6E Invs., LLC v. City of Yuma, Ariz.,*
  818 F.3d 493 (9th Cir. 2016) ................................................................ 24

*Haupt v. United States,*
  330 U.S. 631 (1947) .......................................................................... 36

*Mendiola-Martinez v. Arpaio,*
  836 F.3d 1239 (9th Cir. 2016) ............................................................ 24

*Pac. Shores Properties, LLC v. City of Newport Beach,*
  730 F.3d 1142 (9th Cir. 2013) ............................................................ 24

*Price v. U.S. Dep't of Justice,*
  865 F.3d 676 (D.C. Cir. 2017) ............................................................ 29

*R.A.V. v. City of St. Paul, Minn.,*
  505 U.S. 377 (1992) ................................................................... passim

*United States v. Aguilar,*
  883 F.2d 662 (9th Cir. 1989) ..................................................... passim

*United States v. Arenas-Ortiz,*
  339 F.3d 1066 (9th Cir. 2003) ............................................................ 38

*United States v. Arias,*
  575 F.2d 253 (9th Cir. 1978) ............................................................. 26

*United States v. Armstrong,*
  517 U.S. 456 (1996) ................................................................... passim

*United States v. Banuelos-Rodriguez,*
  215 F.3d 969 (9th Cir. 2000) ............................................................. 23

*United States v. Barber,*
  603 F. App'x 643 (9th Cir. 2015) ....................................................... 38

iii

# TABLE OF AUTHORITIES (continued)

**DESCRIPTION**                                                              **PAGE(S)**

*United States v. Bass,*
  536 U.S. 862 (2002) ..................................................................... 25, 32

*United States v. Bourgeois,*
  964 F.2d 935 (9th Cir. 1992) .................................................. 25, 32, 38

*United States v. Candia-Veleta,*
  104 F.3d 243 (9th Cir. 1996) ..................................................... 38

*United States v. Ford,*
  821 F. App'x 742 (9th Cir. 2020) .............................................. 38

*United States v. Gentile,*
  782 F. App'x 559 (9th Cir. 2019) .............................................. 38

*United States v. Gonzalez-Torres,*
  309 F.3d 594 (9th Cir. 2002) ..................................................... 26

*United States v. Hastings,*
  126 F.3d 310 (4th Cir. 1996) ..................................................... 29

*United States v. Hinkson,*
  585 F.3d 1247 (9th Cir. 2009) ................................................... 21

*United States v. Judd,*
  579 F. Supp. 3d 1 (D.D.C. 2021) .......................................... 30, 31

*United States v. Lewis,*
  517 F.3d 20 (1st Cir. 2008) ....................................................... 28

*United States v. Martinez,*
  589 F. App'x 371 (9th Cir. 2015) .............................................. 38

*United States v. McGibney,*
  2020 WL 4746179 (N.D. Ind. Aug. 14, 2020) ....................... 10

*United States v. Miner,*
  2021 WL 2953178 (E.D.N.Y. July 13, 2021) .......................... 10

iv

# TABLE OF AUTHORITIES (continued)

**DESCRIPTION**                                                   **PAGE(S)**

*United States v. Ness,*
   652 F.2d 890 (9th Cir. 1981)................................................34, 36, 37

*United States v. Nixon,*
   418 U.S. 683 (1974).......................................................22, 24

*United States v. Olson,*
   504 F.2d 1222 (9th Cir. 1974).........................................23, 24

*United States v. Redondo-Lemos,*
   955 F.2d 1296 (9th Cir. 1992).........................................29

*United States v. Rhodes,*
   2022 WL 3042200 (D.D.C. Aug. 2, 2022)....................................30, 31

*United States v. Scott,*
   521 F.2d 1188 (9th Cir. 1975)...........................................26

*United States v. Sellers,*
   906 F.3d 848 (9th Cir. 2018)..........................................21, 25

*United States v. Smith,*
   231 F.3d 800 (11th Cir. 2000)....................................27, 28

*United States v. Solorio-Mendoza,*
   731 F. App'x 583 (9th Cir. 2018).........................................38

*United States v. Steele,*
   461 F.2d 1148 (9th Cir. 1972)..................................... passim

*United States v. Tuitt,*
   68 F. Supp. 2d 4 (D. Mass. 1999)......................................24

*United States v. Turner,*
   104 F.3d 1180 (9th Cir. 1997)..................................... passim

*United States v. Williams,*
   68 F.4th 564 (9th Cir. 2023) ........................................19, 24

# TABLE OF AUTHORITIES (continued)

**DESCRIPTION**                                                    **PAGE(S)**

*Village of Arlington Heights v. Metro. Hous. Dev. Corp.*,
   429 U.S. 252 (1977) ............................................................... 24

*Virginia v. Black*,
   538 U.S. 343 (2003) .......................................................... 35, 41

*Wayte v. United States*,
   470 U.S. 598 (1985) ................................................... passim

*Wisconsin v. Mitchell*,
   508 U.S. 476 (1993) ................................................... passim

**Federal Statutes**

13 U.S.C. § 221 ................................................................... 39

18 U.S.C. § 844 ............................................................. 11, 12

18 U.S.C. § 3231 .................................................................. 3

18 U.S.C. § 3731 ........................................................ 3, 19, 20

28 U.S.C. § 1291 ................................................................ 19

**Federal Rules**

Fed. R. App. P. 4(b)(1)(B) ..................................................... 3

No. 23-50016

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellant,*

*v.*

NATHAN WILSON AND CHRISTOPHER BEASLEY,
*Defendants-Appellees.*

*APPEAL FROM THE UNITED STATES DISTRICT COURT*
*FOR THE CENTRAL DISTRICT OF CALIFORNIA*
*DISTRICT COURT NO. CR 20-516-FMO*

## GOVERNMENT'S OPENING BRIEF

## I

## INTRODUCTION

This is an arson case: defendant Nathan Wilson, along with co-defendant Christopher Beasley, set fire to a police car during a riot, filmed it, and posted the video online. The district court, however, turned this case into something else, ordering the United States to produce a vast array of internal documents on the theory that the

government's efforts to counter "violent anti-government extremists" could amount to selective prosecution.

The district court went badly off the rails. These defendants were indicted for a serious federal crime, and they did not come anywhere close to satisfying the rigorous standard for obtaining discovery on a selective-prosecution claim. They failed to demonstrate discriminatory effect, relying on exactly the sort of generic data that the Supreme Court has deemed inadequate to support selective-prosecution discovery. And they failed to demonstrate discriminatory intent, merely claiming that their arson was motivated by their anti-government views—despite the fact that the federal government is allowed to focus its law-enforcement resources on those who commit acts of political violence, and that having a political motive for one's crime is not a defense.

Because the district court failed to hold defendants to their burden and based its reasoning on the false premise that being a violent anti-government extremist confers immunity from prosecution, its extraordinarily broad discovery order was an abuse of its discretion. Accordingly, the district court's dismissal of the indictment as a

sanction for the government's refusal to comply with that discovery

order should be reversed, and this case remanded for trial.

## II

## ISSUE PRESENTED

Whether defendants demonstrated that their prosecution had a

discriminatory effect and was motivated by discriminatory intent.

## III

## STATEMENT OF THE CASE

### A.    Jurisdiction, Timeliness, and Bail Status

The district court had jurisdiction over defendant's prosecution

under 18 U.S.C. § 3231.  This Court has jurisdiction over the

government's appeal of the district court's dismissal of the indictment

under 18 U.S.C. § 3731.  The district court dismissed the indictment on

December 21, 2022.  (1-ER-3.)  The government filed a timely notice of

appeal on January 19, 2023.  (2-ER-306.)  *See* Fed. R. App. P. 4(b)(1)(B).

Neither defendant is in custody.[1]

---

[1] "CR" refers to the Clerk's Record in the district court and is
followed by the docket number and a specific page number if applicable.
"ER-Video" refers to a video exhibit, filed below as Exhibit 2 to the
government's opposition to the defense motion to dismiss (CR 148); the

(continued . . . .)

**B.      Statement of Facts and Procedural History**

*1.      Defendants Torch a Police Car*

George Floyd's murder on May 25, 2020 set off protests around the country.  On May 31, defendants Nathan Wilson and Christopher Beasley used one such protest in Santa Monica, California, as an opportunity to set fire to a police car.

Wilson and Beasley recorded their arson.  (*See* 2-ER-65–66 (government's filing describing Beasley's video); ER-Video.)  The three-minute video begins with a crowd of onlookers watching various young men hurl objects at a heavily damaged and graffitied police car and smash the car with skateboards.  (ER-Video at 0:23–1:15.)



---

government moves under Circuit Rule 27-14 to transmit that exhibit to this Court, in a separate motion filed along with this brief.

4

After a little over a minute, Beasley asks for a lighter, and Wilson then leans into the front passenger seat with a flaming poster. "Is it working?" Beasley asks. (ER-Video at 1:22.) "Yeah," Wilson responds, as he holds the lit poster up to the seat and passenger-side floorboard.



(*Id.*) "Let it catch first," Beasley instructs as flames start to spring up from the floorboard. (ER-Video at 1:29.) Someone in the crowd suggests lighting the back seat, to which Beasley responds, "that's what I was trying to do, you got a lighter?" (ER-Video at 1:40.) Presumably, Beasley obtains a lighter (though the exchange is not captured on the video) because the screen goes dark as Beasley boasts, "Hey watch me, watch how it's done." (*Id.*; 2-ER-65–66.) Someone then yells, "Five-O"—police—and the crowd briefly disperses, as Beasley's camera resumes a visual recording. Moments later, with no police on the scene,

Beasley turns back to the smoking car. (*Id.*) "Yeeeeaaah!" he cheers, as the fire burns. (ER-Video at 2:11–12; 2-ER-66.)



Beasley climbs onto the roof of the car before the video ends. (ER-Video 3:00–05.) Wilson, meanwhile, takes selfies (ER-131, 133.)

 

6

## 2. *The Attorney General Creates a Task Force on Violent Anti-Government Extremists*

A month after defendants' arson, on June 26, 2020, then–Attorney General William Barr issued a two-page memorandum directing the creation of a "Task Force on Violent Anti-Government Extremists."[2] The Barr Memorandum recounted that, "[a]mid peaceful demonstrations protected by the First Amendment, we have seen anti-government extremists engaged in indefensible acts of violence," including attacking police officers, destroying property, and threatening people. The memorandum clearly distinguished between protestors, on one hand, and "violent anti-government extremists," on the other.

SUBJECT:          Department of Justice Task Force on Violent Anti-Government Extremists

I thank the many dedicated men and women serving the Department of Justice during these historic and challenging times. In recent weeks, we have witnessed significant threats to the rule of law. Amid peaceful demonstrations protected by the First Amendment, we have seen anti-government extremists engaged in indefensible acts of violence designed to undermine public order. Among other lawless conduct, these extremists have violently attacked police officers and other government officials, destroyed public and private property, and threatened innocent people. Although these extremists profess a variety of ideologies, they are united in their opposition to the core constitutional values of a democratic society governed by law. They seek, in essence, to become a law unto themselves by violently opposing those who stand in the way of their particular vision. Some pretend to profess a message of freedom and progress, but they are in fact forces of anarchy, destruction, and coercion.

Over the past month, Department of Justice components—in cooperation with federal, state, and local partners—have vigilantly disrupted violent anti-government extremists of all persuasions. The Department has investigated, disrupted, and—where warranted—prosecuted violent anti-government extremists for violating federal law in districts across the country. All involved should take pride in these accomplishments, which reflect the Department of Justice's fundamental mission to ensure that our country is governed by law, not violent mobs.

---

[2] https://www.justice.gov/archives/ag/page/file/1327271/download.

While some of the challenges to the rule of law that we have seen in recent weeks are fleeting, others are persistent. We have evidence that anti-government violent extremists—including those who support the "Boogaloo," those who self-identify as Antifa, and others—will pose continuing threats of lawlessness. Some of these violent extremists, moreover, may be fortified by foreign entities seeking to sow chaos and disorder in our country. The Department of Justice will respond to these violent groups in the same way we respond to other organized criminal or terrorist networks—by disrupting their violent activities and ultimately dismantling their capability to threaten the rule of law.

To strengthen the Department's capabilities in this important mission, I am today directing the creation of a task force devoted to countering violent anti-government extremists. The task force will be co-headed by Craig Carpenito, U.S. Attorney for the District of New Jersey, and Erin Nealy Cox, U.S. Attorney for the Northern District of Texas. The task force will include members

of United States Attorney's Offices, the FBI, and other relevant components across the Nation. Drawing particularly on the capabilities of the FBI, the task force will develop detailed information about violent anti-government extremist individuals, networks, and movements—and will share that information as appropriate with federal, state, and local law enforcement, especially in places where these extremists pose a threat. The task force will also provide training and identify resources to help law enforcement at all levels identify, investigate, and prosecute violent acts by anti-government extremists. The ultimate goal of the task force will be not only to enable prosecutions of extremists who engage in violence, but to understand these groups well enough that we can stop such violence before it occurs and ultimately eliminate it as a threat to public safety and the rule of law.

### 3. *The FBI Discovers Defendants' Identities and Their Violent Crimes and Exhortations*

Defendants' arson first came to the attention of the FBI several weeks before the Barr Memorandum. Indeed, the FBI identified Beasley the day after defendants' arson, although Wilson—who had been wearing sunglasses and an American-flag bandana over his face— took somewhat longer to find.

On June 1, 2020, Beasley posted a video to his Twitter account, and FBI investigators flagged it later that day. (2-ER-65; 2-ER-149 (FBI report reflecting incident opening on the evening of June 1, 2020).) In the video, Beasley urged the murder of police officers. The "solution

8

to cops killing black people," Beasley opined, "is to kill cops." (2-ER-86.) Also on June 1, the FBI queried various criminal-records databases and discovered that Beasley was a longtime member of the Westside Crips gang and had multiple convictions and arrests for violent crimes. (2-ER-65; 2-ER-86–87.) His rap sheet dates back to at least 2003 and includes convictions for battery, robbery, possessing a firearm as a felon, and obstructing a public officer. (2-ER-291–301.)

A day later, on June 2, the FBI discovered Beasley's video of the May 31 arson. (2-ER-89 (FBI workflow log reflecting that "[p]er Sacramento FBI, Beasley was caught on video burning a vehicle in Los Angeles on 5/31/2020").) At that point, however, the FBI was not able to identify Wilson in the arson video.

Law enforcement found Wilson three months later, after he committed another arson. In September 2020, Wilson's girlfriend called 911 after he lit her car on fire following a domestic dispute. (2-ER-108–109.) She told police that, in addition to setting her car on fire, Wilson had admitted to setting a police car on fire in Santa Monica. (2-ER-111.) The police then investigated Wilson as a suspect in the May 31 arson. (2-ER-112.)

9

Shortly thereafter, on October 6, 2020, the FBI team investigating this case learned that Wilson had previously been investigated for making online threats, including a social-media post that showed a picture of a rifle on a bed with the caption that he had "picked up a double 40 mag so I can kill 80 liberals at a time, as long as they are lined up." (2-ER-117; *see also id.* at 116–124.) Federal investigators found that Wilson had made other disturbing posts too, featuring military-style weapons, body armor, and a reference to "boogaloo time"[3] (2-ER-127, 129):




---

[3] *See United States v. McGibney*, 2020 WL 4746179, *5 (N.D. Ind. Aug. 14, 2020) (describing the "boogaloo" movement as "a fledgling home for domestic terrorism"); *United States v. Miner*, 2021 WL 2953178, *2 (E.D.N.Y. July 13, 2021) (defining "boogaloo purposes" as "slang for a racial civil war in the United States").

And, on the same day that he set the police car on fire, Wilson also vandalized two small businesses in the Santa Monica area. (2-ER-95–106; *see also* CR 1 at 9–10 (complaint).)

## C. Defendants Are Indicted and Make Impossibly Far-Reaching Discovery Demands

A federal complaint was filed as to Wilson on October 9, 2020 (CR 1), and the grand jury indicted both defendants on October 23, 2020 (2-ER-304–305). They were charged with one count: arson of a vehicle belonging to an institution or organization receiving federal financial assistance, in violation of 18 U.S.C. § 844(f)(1). (*Id.*)

In October 2021, Wilson moved to dismiss the indictment on selective-prosecution grounds (2-ER-145–166)—a motion Beasley subsequently joined (CR 132). As evidence of the government's allegedly unconstitutional selective intent ("DOJ's and USAO's Prosecutorial Policies Targeting Protesters"), Wilson relied on the Barr Memorandum noted above as well as the former Attorney General's public statements, including an interview in which he stated that members of the "antifa" movement "go in to . . . demonstrations, which are exercising First Amendment activity," and then "hijack these demonstrations" and "provoke violence." (2-ER-152–154.) Wilson also

11

quoted the former President as complaining about "professional
anarchists, violent mobs, arsonists, looters, criminals, rioters, Antifa,
and others," and threatening "the organizers of this terror" with "severe
criminal penalties." (2-ER-153.)

As an alternative to outright dismissal, Wilson and Beasley
demanded that the government produce a vast array of internal
communications and documents, many unrelated to this case (2-ER-166,
287–289):

> 1. A list by case number of all cases brought by the U.S.
> Attorney's Office for the Central District of California
> charging violations of 18 U.S.C. §§ 844(f) and (i) in the last
> four years.
>
> 2. Identify whether state, federal, or joint law
> enforcement authorities investigated each of the cases listed
> in response to Question 1.
>
> 3. Explain the criteria used by the U.S. Attorney's Office
> for the Central District of California for deciding whether to
> file charges for violations of 18 U.S.C. §§ 844(f) and (i).
>
> 4. Explain the criteria used by the U.S. Attorney's Office
> for the Central District of California for deciding whether to
> federally prosecute a person who was investigated and/or
> prosecuted by the local or state authorities and/or local or
> state government for arson.
>
> 5. A list of all persons who were considered by the U.S.
> Attorney's Office for the Central District of California for
> prosecution for a violation of 18 U.S.C. §§ 844(f) and (i) in

the last four years but for whom prosecution was declined and the reason for why prosecution was declined.

6.    All communications, including but not limited to emails, voicemails, text messages, and records of phone calls (phone log), between any attorney or employee of the U.S. Attorney's Office for the Central District of California and the Los Angeles District Attorney's Office related to the decision to prosecute Nathan Wilson.

7.    All communications, including but not limited to emails, voicemails, text messages, and records of phone calls, between any federal agent or any attorney or employee of the U.S. Attorney's Office for the Central District of California and the Santa Monica Police Department or the Santa Monica Fire Department related to the decision to prosecute Nathan Wilson.

8.    All communications, including but not limited to emails, voicemails, text messages, and records of phone calls, between and among attorneys and/or employees of the U.S. Attorney's Office for the Central District of California related to the decision to prosecute Nathan Wilson.

9.    All communications, including but not limited to memorandums, emails, voicemails, text messages, and records of phone calls, between any attorney or employee of the U.S. Attorney's Office for the Central District of California and any employee or attorney of the Department of Justice related to the decision to prosecute Nathan Wilson.

10.    All communications, including but not limited to memorandums, emails, voicemails, text messages, and records of phone calls, between any attorney or employee of the U.S. Attorney's Office for the Central District of California and any employee or attorney of the Department of Justice related to the decision to federally prosecute cases arising out of the civil unrest associated with the death of

George Floyd and/or racial injustice, beginning on or about May 26, 2020, and continuing to September 2020.

11.    In a leaked and widely reported conference call in September 2020, the Attorney General told the U.S. Attorneys from across the country—presumably including the U.S. Attorney for the Central District of California—to seek federal charges when charging demonstrators even when state charges could apply. . . .  [A]ny existing transcripts of the call, memorandums that were produced related to the call, and any available notes from the call.

12.    In April 2020, the Attorney General sent a memorandum to U.S. Attorneys Offices regarding protections for anti-lockdown protestors. . . .  [A]ny memorandums Barr sent discussing the rights of anti-lockdown protestors.

The government opposed defendants' motion, arguing that (1) dismissal was unwarranted because defendants had failed to establish a discriminatory purpose or effect (2-ER-71–80) and (2) discovery was unwarranted because defendants had not satisfied the "rigorous" applicable standard (2-ER-80–82 (quoting *United States v. Armstrong*, 517 U.S. 456, 468 (1996))).  That rigorous standard for discovery required "'some evidence tending to show the existence of the essential elements' of a selective-prosecution claim"—that is, both discriminatory effect and discriminatory intent.  (2-ER-81 (quoting *Armstrong*, 517 U.S. at 468)).)  Defendants had shown neither.  (2-ER-80–81.)

14

**D.     The District Court Grants Defendants' Far-Reaching Discovery Requests in Full**

The district court denied defendants' motion to dismiss without prejudice but granted their discovery requests in full, subject only to potential objections based on the deliberative-process privilege.  (1-ER-30–31.)  To the extent the government claimed that privilege, it would be required to "provide a detailed explanation as to which specific document is protected."  (1-ER-31.)

The court reasoned that "the evidence in the record is sufficient to constitute some evidence that defendants were targeted for federal prosecution, at least in part because of their anti-government views and association with the George Floyd protests."  (1-ER-27.)  However, unlike the Barr Memorandum, which addressed only "*violent* anti-government extremists" (emphasis added), the district court's order drew no clear distinction between protesters and rioters, repeatedly conflating those who protested the murder of George Floyd with those who—like defendants—engaged in their own acts of violence instead. (*See, e.g.*, 1-ER-26 (equating "individuals accused of engaging in criminal activity during the George Floyd protests" with "individuals associated with the protests who the government believed, or had

reason to believe, held 'anti-government' views"); 1-ER-27 (equating "George Floyd protesters" with "extremists [who] profess a variety of ideologies but are united in their opposition to the core constitutional values of a democratic society governed by law" (quoting the Barr Memorandum's description of the "violent anti-government extremists")). Based on the district court's false equivalence between protesters and criminal rioters, the court concluded that the Barr Memorandum constituted "explicit DOJ policy . . . indicating that the government specifically targeted for federal prosecution those individuals associated with the George Floyd protests it believed held anti-government views." (1-ER-28.)

The district court further ruled that various public statements by the former Attorney General and former President confirmed this "discriminatory intent." (1-ER-28–29.) And the court undertook a survey of the federal arson prosecutions brought in the Central District of California in the past couple decades, concluding that federal "stand-alone arson charges" are extremely rare and that this case is "one of the first" in recent memory. (1-ER-19.) That fact, the district court concluded, was also evidence of "purposeful discrimination" (1-ER-21–

16

22), quoting the lone decision of this Court to have found merit to a selective-prosecution claim, *United States v. Steele*, 461 F.2d 1148 (9th Cir. 1972), in which the only individuals prosecuted for refusing to complete their U.S. Census questionnaires were the four most prominent and public anti-census advocates in the district, *see id.* at 1150–51.

Unlike in *Steele*, however, the district court did not compare defendant to other individuals who had committed the same crime (there, refusing to complete the census; here, burning a police car during a riot). Although the government argued that *other rioters* who committed arson were the relevant, similarly situated individuals for evaluating defendants' selective-prosecution claim (*see* 2-ER-77), the district court reasoned that other arsonist rioters would be "part of the same arbitrary classification the defendant is challenging" (1-ER-20 (internal quotation marks omitted)), and that, instead, "the proper comparator group must be all arsons that occurred in the district that could have been charged federally but were not" (1-ER-21 (quoting and adopting defense counsel's argument)).

In sum, the district court concluded that the government had (likely) engaged in improper selective prosecution of defendants based principally on a public memorandum and statements from the former Attorney General, which directed federal resources toward prosecuting "violent anti-government extremists" who "hijack[ed]" lawful protests. (*See* 2-ER-152–154; Barr Memorandum, *supra*.) That memorandum, combined with the relative rarity (until 2020) of stand-alone federal arson prosecutions in the Central District of California, led the district court to effectively bar defendants' prosecution by entering an unprecedented and impossibly broad discovery order—requiring production of, among other things, all notes from a conference call the Attorney General held with U.S. Attorneys around the country, all communications between any Assistant U.S. Attorney and anyone else in the Department of Justice regarding prosecution decisions related to "the civil unrest associated with the death of George Floyd and/or racial injustice," and "any memorandums Barr sent discussing the rights of anti-lockdown protestors." (2-ER-287–289.)

**E.    The District Court Denies Reconsideration and Dismisses the Indictment**

The government moved for reconsideration, laying out the ways in which the district court's reasoning was wrong and reiterating the fundamental point that "the government is allowed to prioritize the prosecution of arson during a riot over random or sporadic arson, and is entitled to prioritize prosecution of violence against government victims." (2-ER-52.) The district court denied the motion to reconsider. (2-ER-4–10.) Additionally, the district court dismissed the indictment as a sanction for the government's refusal to comply with the court's discovery order (1-ER-10 n.4, citing 2-ER-57–58)—the same procedure followed in *Armstrong* and *United States v. Turner*, 104 F.3d 1180 (9th Cir. 1997), in order to obtain immediate review under 18 U.S.C. § 3731 of an overly broad discovery order directed against the government.[4]

---

[4] This Court may also have jurisdiction over an appeal from the discovery order itself (as opposed to the indictment's dismissal) under 28 U.S.C. § 1291 and the collateral-order doctrine. *Cf. United States v. Williams*, 68 F.4th 564, 570 (9th Cir. 2023) (allowing immediate review of an overly broad disqualification order against government counsel, even though disqualification of defense counsel is generally *not* subject to interlocutory appeal, citing the "special solicitude owed to Executive branch prerogatives under the separation of powers"). Because the

(continued . . . .)

# IV

# SUMMARY OF ARGUMENT

There is no First Amendment right to burn a police car. To obtain discovery on their selective-prosecution claim, defendants were required to adduce evidence of both discriminatory effect and discriminatory intent. They did neither.

The discriminatory-effect prong required defendants to identify a similarly situated control group of non-prosecuted lawbreakers who were the same as defendants in all relevant respects except that defendants were exercising their constitutional rights. The district court erred by defining a vastly overinclusive and non-specific control group of all (not even federally) prosecutable arsonists in the past two decades and by permitting defendants to satisfy their burden based on raw statistics of overall arson charges without any information about the relevant facts of the underlying cases.

The discriminatory-intent prong required defendants to show that they were targeted because of their *non-criminal* protest activity.

---

district court dismissed the indictment, however, this Court need not address the issue, since jurisdiction plainly lies under 18 U.S.C. § 3731.

Defendants here had no such protest activity; the district court erred by conflating speech with rioting. There was no evidence that defendants were targeted for prosecution because of their political views separate and apart from the motives for their crime. Arson is not protected merely because it expresses "anti-government" sentiment, and the government is allowed to prosecute politically motivated violence.

Either of the district court's legal errors independently warrants reversal.

# V

## STANDARD OF REVIEW

Whether the defense "ma[d]e the requisite discovery showing" in support of a selective prosecution claim is reviewed for abuse of discretion. *United States v. Sellers*, 906 F.3d 848, 851–52 (9th Cir. 2018). But "whether the district court applied the correct discovery standard is a legal question" reviewed de novo, *id.*, and a district court necessarily abuses its discretion "when it makes an error of law," *see United States v. Hinkson*, 585 F.3d 1247, 1261 (9th Cir. 2009) (en banc).

# VI

# ARGUMENT

## A. Selective-Prosecution Claimants Must Demonstrate Both Discriminatory Effect and Discriminatory Intent

Because "[t]he Attorney General and United States Attorneys retain broad discretion to enforce the Nation's criminal laws," a "presumption of regularity supports their prosecutorial decisions and, in the absence of clear evidence to the contrary, courts presume that they have properly discharged their duties." *Armstrong*, 517 U.S. at 464 (cleaned up). As a result, "[i]n the ordinary case, so long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion." *Id.*

That presumption of regularity "also stems from a concern not to unnecessarily impair the performance of a core executive constitutional function." *Id.* at 465. "[T]he Executive Branch has exclusive authority and absolute discretion to decide whether to prosecute a case," *United States v. Nixon*, 418 U.S. 683, 693 (1974), and in all but the most extraordinary circumstances, the separation of powers commands "that

the courts are not to interfere with the free exercise of the discretionary powers of the attorneys of the United States in their control over criminal prosecutions," *United States v. Olson*, 504 F.2d 1222, 1225 (9th Cir. 1974). "Judicial supervision in this area, moreover, entails systemic costs of particular concern. Examining the basis of a prosecution delays the criminal proceeding, threatens to chill law enforcement by subjecting the prosecutor's motives and decisionmaking to outside inquiry, and may undermine prosecutorial effectiveness by revealing the Government's enforcement policy." *Wayte v. United States*, 470 U.S. 598, 607 (1985); *see also United States v. Banuelos-Rodriguez*, 215 F.3d 969, 977 (9th Cir. 2000) ("We repeatedly have echoed that theme," citing cases).

To overcome these separation-of-powers concerns and obtain dismissal of criminal charges on a theory of selective prosecution, a defendant must present "clear evidence" that the government's decision to prosecute was "based on an unjustifiable standard such as race, religion, or other arbitrary classification." *Armstrong*, 517 U.S. at 464–65 (citations omitted). "Mere selectivity in prosecution creates no constitutional problem." *Steele*, 461 F.2d at 1151. *Armstrong*'s

23

"demanding" and "rigorous" standard, 517 U.S. at 463, 468, requires proof "that the federal prosecutorial policy had a discriminatory effect *and* that it was motivated by a discriminatory purpose." *Id.* at 465 (emphasis added). "Both prongs must be demonstrated for the defense to succeed." *Turner*, 104 F.3d at 1184.[5]

Furthermore, to ensure that selective-prosecution claims do not "divert prosecutors' resources" and reveal "prosecutorial strategy," the Supreme Court has imposed a "correspondingly rigorous standard for discovery in aid of such a claim." *Armstrong*, 517 U.S. at 468. A

---

[5] There is no merit to the district court's suggestion that a sufficient amount of evidence on one prong can satisfy the other. (1-ER-25–26.) The cases the court cited—with the exception of a 1999 district court decision, *United States v. Tuitt*, 68 F. Supp. 2d 4, 10 (D. Mass. 1999), which "conflated the elements of effect and intent" contrary to this Court's later decision in *Turner*—are all civil suits against municipalities and private employers, not a defense to the Executive Branch's sovereign authority to punish violations of criminal law. *See Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977); *Ave. 6E Invs., LLC v. City of Yuma, Ariz.*, 818 F.3d 493, 504 (9th Cir. 2016); *Pac. Shores Properties, LLC v. City of Newport Beach*, 730 F.3d 1142, 1166 (9th Cir. 2013); *Mendiola-Martinez v. Arpaio*, 836 F.3d 1239, 1261 (9th Cir. 2016). The separation-of-powers concerns in the latter situation are severe, and have been repeatedly recognized by this Court and the Supreme Court. *Nixon*, 418 U.S. at 693; *Wayte*, 470 U.S. at 607; *Olson*, 504 F.2d at 1225; *cf. Williams*, 68 F.4th at 570 (disqualification of prosecutors).

24

defendant seeking discovery must "must present specific facts, not mere allegations, which establish a colorable basis for the existence of both discriminatory application of a law and discriminatory intent on the part of government actors." *United States v. Bourgeois*, 964 F.2d 935, 940 (9th Cir. 1992); *see also United States v. Bass*, 536 U.S. 862, 863 (2002) (per curiam) (absent "some evidence of both discriminatory effect and discriminatory intent," a defendant is not entitled to "discovery on a claim of selective prosecution"). And that evidence must be "solid" and "credible"—"hearsay" or "personal conclusions based on anecdotal evidence" will not do. *Armstrong*, 517 U.S. at 468, 470; *Bourgeois*, 964 F.2d at 940. "This is a high threshold" that only "the rare defendant" can meet. *Bourgeois*, 964 F.2d at 939. Indeed, as this Court has explained, "the standard for discovery" under *Armstrong* is "nearly as rigorous as that for proving the claim itself," because "the standard was intentionally hewn closely to the claim's merits requirements." *Sellers*, 906 F.3d at 852.

\*\*\*

The district court misunderstood and misapplied these principles. As set forth in the following two subsections, the district court erred in its legal analysis on both prongs and thereby abused its discretion.

## B.     Defendants Failed to Demonstrate Discriminatory Effect

To prove discriminatory effect, a defendant bears the burden of showing that "others similarly situated generally have not been prosecuted for conduct similar to that for which he was prosecuted." *United States v. Scott*, 521 F.2d 1188, 1195 (9th Cir. 1975); *see also United States v. Arias*, 575 F.2d 253, 255 (9th Cir. 1978) (same). The similarly situated comparison or "control group" must be the same as the defendant "in all relevant respects, except that defendant was, for instance, exercising his first amendment rights." *United States v. Aguilar*, 883 F.2d 662, 706 (9th Cir. 1989), *superseded by statute on other grounds as stated in United States v. Gonzalez-Torres*, 309 F.3d 594, 599 (9th Cir. 2002). Lawbreakers are not "similarly situated" unless they "committed the same basic crime in substantially the same manner," such that their prosecutions "would have the same deterrence value and would be related in the same way to the Government's

enforcement priorities and enforcement plan." *United States v. Smith*, 231 F.3d 800, 810 (11th Cir. 2000).

The standard therefore requires defendants to demonstrate a close fit between themselves and their proposed control group. Thus, in *Turner*, this Court rejected the argument that large-scale crack-cocaine defendants associated with violent street gangs could compare themselves to crack-cocaine defendants who may not have been "gang members who sold large quantities of crack." 104 F.3d at 1185. By omitting that "principal characteristic"—gang membership—the defendants failed to show they were "similarly situated" to the other crack dealers they cited. *Id.*

The district court made the same mistake here. It adopted defendants' contention that "the proper comparator group must be all arsons that occurred in the district that could have been charged federally but were not." (1-ER-21.) That was wrong. It permitted the defense to define a vastly overinclusive control group with no salient characteristics at all—much less a comparison group that was equivalent "in all relevant respects," *Aguilar*, 883 F.2d at 706, whose members committed "the same basic crime in substantially the same

27

manner." *Smith*, 231 F.3d at 810. The defense asserted that approximately 3,500 arsons, on average, were reported each year between 2010 and 2019 in the Central District of California (2-ER-149–150), but provided no other facts about these incidents. Accordingly, there was no basis upon which to compare those cases against defendants' and no basis to believe that those arsonists were "similarly situated" to defendants. *Turner*, 104 F.3d at 1185. The raw data alone did not indicate which other arsons were even eligible for federal prosecution, much less whether those arsons involved police vehicles, violently smashed property, a crowd of onlookers, filmed recordings posted online, or defendants with substantial criminal records.

All of those unknown facts mattered. While the government may not defeat a selective-prosecution claim by invoking distinctions that have no bearing on the decision whether to prosecute, a "multiplicity of factors legitimately may influence the government's decision to prosecute one individual but not another," *United States v. Lewis*, 517 F.3d 20, 27 (1st Cir. 2008), and defendants are not similarly situated unless "their circumstances present *no* distinguishable legitimate prosecutorial factors that might justify making different prosecutorial

decisions with respect to them," *United States v. Hastings*, 126 F.3d 310, 315 (4th Cir. 1996) (emphasis added).

There were multiple such factors here. First, the evidence is strong: Beasley recorded himself committing the arson, and Wilson confessed his involvement to his girlfriend. Second, the men have engaged in additional criminal activity: Beasley has multiple prior convictions for burglary, robbery, firearms possession, and obstructing an officer, and Wilson committed a second arson three months later. Third, the men have threatened violence: Beasley urged others "to kill cops" on social media, and Wilson posted on social medial that his assault rifle could "kill 80 liberals at a time." (2-ER-86, 117.) All of those circumstances reflect legitimate criminal justice considerations. *See United States v. Redondo-Lemos,* 955 F.2d 1296, 1299 (9th Cir. 1992) ("Prosecutorial charging . . . . decisions are normally made as a result of careful professional judgment as to the strength of the evidence, the availability of resources, the visibility of the crime[,] and the likely deterrent effect on the particular defendant and others similarly situated." (citation and footnote omitted)); *see also Price v. U.S. Dep't of Justice*, 865 F.3d 676, 681 (D.C. Cir. 2017) (observing that

in plea negotiations a prosecutor may legitimately consider "concerns such as rehabilitation, allocation of criminal justice resources, the strength of the evidence against the defendant, and the extent of a defendant's cooperation" (brackets and citation omitted)). Here, however, without any information on the nature and circumstances of the other arsons they invoked, defendants failed to identify any similarly situated cases at all. They did not demonstrate that a single lawbreaker who was "the same in all relevant respects," *Aguilar*, 883 F.2d at 706, had gone unprosecuted by the federal government.

Recent decisions dealing with the January 6, 2021, Capitol riot illustrate this principle, as the government pointed out below. (2-ER-54–55.) Defendants in those cases unsuccessfully argued that they were the victims of selective prosecution because rioters who attacked the federal courthouse in Portland were not prosecuted. *See United States v. Rhodes*, 2022 WL 3042200, *5 (D.D.C. Aug. 2, 2022); *United States v. Judd*, 579 F. Supp. 3d 1, 3–4 (D.D.C. 2021). That claim failed because there were "distinguishable legitimate prosecutorial factors that might justify different prosecutorial decisions," including the time of day of each riot, the threat each riot posed to others, the planning

30

involved, and the methods employed. *Rhodes*, 2022 WL 3042200, at *5; *Judd*, 579 F. Supp. 3d at 8. The distinguishing factors not only defeated dismissal motions, as in *Rhodes*, but also defeated discovery attempts, as in *Judd*. Indeed, in *Judd*, the district court appeared to agree with the defendant's objection to the government's differential treatment of the Capitol rioters compared to the Portland rioters—yet the court *still* denied defendant's discovery demand, because it fell short of the "rigorous" showing required by *Armstrong*. 579 F. Supp. 3d at 5, 7–9. As the *Judd* court recognized, "[f]ew subjects are less adapted to judicial review than the exercise by the Executive of his discretion in deciding when and whether to institute criminal proceedings." *Id.* at 4 (quoting precedent).

The district court in this case violated those principles by going in the opposite direction. It penalized the government for failing to federally prosecute the burning of a historic mission in 2020 and a fire station in 2019, citing newspaper articles but no actual information about the cases. (1-ER-23.)[6] And without any "solid, credible evidence"

---

[6] In addition to the many other legitimate distinguishing features discussed above, there is no mention in the district court's decision

(continued . . . .)

to go on about whether any other arson suspect was similarly situated in "all relevant respects," *Bourgeois*, 964 F.2d at 940; *Aguilar*, 883 F.2d at 706, the district court resorted to raw statistics about the total number of arsons and a presumption that the United States Attorney's Office "was no doubt aware of many of th[ose] arsons—some of which were very serious." (1-ER-23.)

The Supreme Court has condemned that approach. "[R]aw statistics regarding overall charges say nothing about charges brought against *similarly situated defendants*." *Bass*, 536 U.S. at 864 (emphasis in original). The district court pointed to no example—and defendants provided none—of a person similarly situated to either defendant who was not federally prosecuted. Indeed, putting aside the strength of the evidence, the criminal histories of these defendants, and other relevant

---

about whether either arson was prosecuted by the State of California. Using internet media sources, as did the district court and defense, it appears they were. *See* "Man ordered to stand trial in fire that badly damaged the San Gabriel Mission," Pasadena Star News (Dec. 30, 2022), https://www.pasadenastarnews.com/2022/12/30/man-ordered-to-stand-trial-in-fire-that-badly-damaged-the-san-gabriel-mission; Press Release, "Serial Arsonist and Fire Station Burglary Suspect in Custody," Orange County Fire Authority (Aug. 27, 2019), *available at* https://www.atf.gov/news/docs/undefined/serialarsonistandfirestationburglarysuspectincustody-jointpressreleasepdf/download.

factors, defendants have not even identified any other rioter who burned a police car but was not federally prosecuted. In short, the district court erred by evaluating "discriminatory effect" based on exactly the sort of generalized, overbroad statistics that precedent prohibits. For this reason alone, its decision should be reversed.

## C. Defendants Failed to Demonstrate Discriminatory Intent

Defendants also failed to show "discriminatory intent" based on their (purported) "anti-government views."[7] The district court's premise—that being a *violent* anti-government extremist is some form of protected classification—is unprecedented and wrong.

Focusing prosecutorial resources on violent anti-government extremists is a legitimate exercise of prosecutorial discretion, not illicit discrimination. The federal government has a right—arguably, an obligation—to focus its law-enforcement resources on those who commit

---

[7] Neither defendant had clearly discernable political views; the district court simply assumed they were "targeted for imputed anti-government views" because they set fire to a police car around the same time that others were lawfully protesting. (1-ER-21.)

acts of political violence or domestic terrorism.[8]  Having a political motive for one's crime is not a defense.  The government also has the authority to focus its resources on those who would use an otherwise-peaceful protest as a cover to riot.

Neither law nor common sense prevents federal prosecutors from using the federal arson statute against politically motivated rioters. "The First Amendment does not protect violence." *Wisconsin v. Mitchell*, 508 U.S. 476, 484 (1993).  And the government is allowed to have "enforcement priorities," *Wayte*, 470 U.S. at 607, including deterring politically motivated criminal conduct, *see United States v. Ness*, 652 F.2d 890, 892 (9th Cir. 1981) (tax defiers).  Political activity is protected; political *motives* for crime are not.

The Supreme Court explained this distinction in *R.A.V. v. City of St. Paul, Minn.*, 505 U.S. 377 (1992).  The government cannot engage in "content discrimination" that is "unrelated" to the "proscribable" conduct at issue.  *Id.* at 385.  So, for example, a state can ban "fighting

---

[8] *See, e.g.*, Attorney General Merrick B. Garland Remarks: Domestic Terrorism Policy Address (June 15, 2021), *available at* https://www.justice.gov/opa/speech/attorney-general-merrick-b-garland-remarks-domestic-terrorism-policy-address.

words," but not "fighting words" limited to specific topics. *Id.* at 392.
Even there, though, the Court distinguished between *topics* and *people*,
"emphasiz[ing]" that its holding did not prevent states from banning
"fighting words that are directed at certain persons or groups." *Id.* at
392. As the Court explained, "nonverbal expressive activity" cannot be
banned "because of the ideas it expresses," but it can be "banned
because of the action it entails." *Id.* at 385.

Along the same lines, a year later, the Court upheld a hate-crime
statute—which banned otherwise-illegal conduct directed at a person
because of the person's membership in a particular group—because a
criminal's "motive" for committing a crime is not protected by the First
Amendment. *Mitchell*, 508 U.S. at 485–86. And later, in a cross-
burning case, the Court reiterated *R.A.V.*'s holding that "content
discrimination" does not violate the First Amendment when "the basis
for the content discrimination consists entirely of the very reason the
entire class of speech at issue is proscribable"—there, burning a cross
with intent to intimidate. *Virginia v. Black*, 538 U.S. 343, 361 (2003).
By the same token, the government can treat threats against the
President differently from normal threats, even if there might be (and

35

likely is) some political motive to those threats. *See R.A.V.*, 505 U.S. at 388; *see also Mitchell*, 508 U.S. at 489 (noting that there is no First Amendment right to commit treason, citing *Haupt v. United States,* 330 U.S. 631 (1947)). In short, "acts are not shielded from regulation merely because they express a[n] . . . idea or philosophy." *R.A.V.*, 505 U.S. at 390.

Were the rule otherwise, hate crimes would be shielded by the First Amendment. Other crimes would be too. The government would be unable to prioritize the prosecution of any politically motivated criminals, from tax defiers to January 6 rioters. *But see Ness*, 652 F.2d at 892 ("Tax violations are not a protected form of political dissent."). The implication of defendants' claim here is that by hoisting the banner of protest, they can insulate themselves from prosecution. "On principle, such a view would allow any criminal to obtain immunity from prosecution simply by reporting himself and claiming that he did so in order to 'protest' the law. The First Amendment confers no such immunity from prosecution." *Wayte*, 470 U.S. at 614.

The district court was therefore wrong to accept defendants' selective-prosecution argument based on a claim that their "offense was

associated with expressive conduct." (1-ER-25.) Burning a police car is "not shielded from regulation merely because" it expresses an "idea or philosophy." *R.A.V.*, 505 U.S. at 390. Politically motivated arson is not constitutionally protected. "[V]iolence" takes rioting, and in this case arson, outside the realm of the First Amendment. *Mitchell*, 508 U.S. at 484. The government can prosecute arson during a riot, or politically motivated arson, more harshly than other arson. There are obvious reasons why. One is to protect the public from the danger posed by a simultaneous breach of the peace by a large number of people. *See Ness*, 652 F.2d at 892 ("deterrence of widespread" criminal activity is a permissible consideration); *see also Wayte*, 470 U.S. at 607. Another is to protect the *actual* First Amendment rights of other people: allowing rioters to "hijack" a protest undermines *the protesters'* right to free speech. A rule inflicting rioters on lawful protestors would be a "grave perversion of proper sensitivity to the civil liberty" of the law-abiding group. *Cf. Turner*, 104 F.3d at 1185. These are permissible considerations, even if a riot has political overtones.

In short, there is no authority for the district court's premise that burning a police car is a constitutionally protected means of expressing

37

one's anti-government views, either as a matter of law or common

sense.  For this reason, as well, the district court's decision should be

reversed.

## D.  The District Court Erred by Relying on *United States v. Steele*

The district court relied heavily (1-ER-21–22) on *United States v.*

*Steele*, 461 F.2d 1148 (9th Cir. 1972), which was decided over half a

century ago and appears to be this Court's only decision finding merit to

a selective-prosecution claim following *Armstrong* (which itself reversed

a decision of this Court requiring discovery, *see* 517 U.S. at 461).[9]

*Steele*, however, is distinguishable on both prongs of the selective-

---

[9] Since *Armstrong*, this Court has ruled against selective-prosecution discovery claims time and again.  *Turner* reversed a grant of selective-prosecution discovery, 104 F.3d at 1184, and many other cases have affirmed the denial of selective-prosecution discovery, *see, e.g.*, *United States v. Ford*, 821 F. App'x 742, 746 (9th Cir. 2020); *United States v. Gentile*, 782 F. App'x 559, 560 (9th Cir. 2019); *United States v. Solorio-Mendoza*, 731 F. App'x 583, 587 (9th Cir. 2018); *United States v. Barber*, 603 F. App'x 643 (9th Cir. 2015); *United States v. Martinez*, 589 F. App'x 371 (9th Cir. 2015); *United States v. Arenas-Ortiz*, 339 F.3d 1066, 1069 (9th Cir. 2003); *United States v. Candia-Veleta*, 104 F.3d 243, 246 & n.3 (9th Cir. 1996); *Bourgeois*, 964 F.2d at 936; *Aguilar*, 883 F.2d at 705.

prosecution test—the defendants in that case, unlike here, established both discriminatory effect and discriminatory intent.

In *Steele*, the government prosecuted four defendants for refusing to answer the census, in violation of 13 U.S.C. § 221. 461 F.2d at 1150. Those four defendants were the only people in Hawaii chosen for prosecution, even though "Steele himself located six other persons who had completely refused on principle to complete the census forms" but who were not prosecuted. *Id.* at 1151. The four defendants selected for prosecution "had participated in a census resistance movement, publicizing a dissident view of the census as an unconstitutional invasion of privacy and urging the public to avoid compliance with census requirements." *Steele*, 461 F.2d at 1150–51. The six non-responders who were not prosecuted had not "taken a public stand against the census." *Id.* at 1151.

Those facts met the discriminatory-effect standard because the four prosecuted defendants and their six non-prosecuted counterparts "had committed the same offense." *Id.* Apart from the fact that the four prosecuted defendants "had publicly attacked the census," *id.* at 1152,

there were no other characteristics that distinguished them from their non-prosecuted counterparts.

The facts in *Steele* also met the discriminatory-intent standard because the four prosecuted defendants were targeted for *actually protected* conduct. They had exercised their First Amendment rights by holding a press conference, leading a protest march, distributing pamphlets criticizing the census, broadcasting editorials, and speaking out against the census on the radio. *Id.* at 1151. They could not be selected for prosecution based on *separate*, non-criminal, protected expression. They did not set fire to the car of a census-taker. Although their refusal to respond to the census was itself expressive—the point was to convey the same census-opposition message—it was the separate speech that was protected, not the crime itself. *Steele* was the rare case where a defendant was able to show that "the Government prosecuted him *because of* his protest activities," as opposed to any expressive content inherent in his crime. *Wayte*, 470 U.S. at 610.

This case is very different. As noted, the defense failed to identify *any* non-prosecuted individuals who committed the same sort of arson defendants did, and there is nothing in the record to suggest that

40

defendants were targeted for prosecution based on any *non-criminal* protected speech. Nor were defendants prosecuted based on any expressive activity separate and apart from their crime or motives. *See Black*, 538 U.S. at 361; *Mitchell*, 508 U.S. at 485–86; *R.A.V.*, 505 U.S. at 390. Defendants were charged because they burned a police car during a riot and filmed it, and because they appear to be dangerous criminals aside from that. Their case should be sent back to the district court so they can be prosecuted.

# VII

# CONCLUSION

This Court should reverse the district court's order dismissing the indictment and remand the case for prosecution.

DATED: June 21, 2023            Respectfully submitted,

E. MARTIN ESTRADA
United States Attorney

MACK E. JENKINS
Assistant United States Attorney
Chief, Criminal Division

BRAM M. ALDEN
Assistant United States Attorney
Chief, Criminal Appeals Section

*s/ Alexander P. Robbins*

ALEXANDER P. ROBBINS
Assistant United States Attorney
Deputy Chief, Criminal Appeals
Section

Attorneys for Plaintiff-Appellant
UNITED STATES OF AMERICA

## STATEMENT OF RELATED CASES

The government states, under Ninth Circuit Rule 28-2.6, that it is unaware of any other case related to this appeal.

## CERTIFICATE OF COMPLIANCE

I certify that:

1.      This brief complies with the length limits permitted by Ninth Circuit Rule 32-1 because the brief contains 7,796 words, including 574 words manually counted in images and excluding the portions exempted by Fed. R. App. P. 32(f), if applicable.

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Century Schoolbook) using Microsoft Word 2016.

DATED: June 21, 2023

s/ Alexander P. Robbins
ALEXANDER P. ROBBINS
Attorney for Plaintiff-Appellant
UNITED STATES OF AMERICA