## No. 23-50016

---

IN THE
## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

———————

UNITED STATES OF AMERICA,
*Plaintiff-Appellant,*

v.

NATHAN WILSON AND CHRISTOPHER BEASLEY,
*Defendants-Appellees.*

———————

On Appeal from the United States District Court
for the Central District of California, No. 2:20-cr-00516-FMO-1
Honorable Fernando M. Olguin

———————

## APPELLEES' ANSWERING BRIEF

———————

MARK M. KASSABIAN
BUEHLER & KASSABIAN, LLP
350 West Colorado Boulevard
 Suite 200
Pasadena, California 91105
(626) 792-0500
mkassabian@
buehlerkassabian.com

*Counsel for Defendant-Appellee*
*Christopher Beasley*

CUAUHTEMOC ORTEGA
FEDERAL PUBLIC DEFENDER
 CENTRAL DISTRICT OF CALIFORNIA
ANDREW B. TALAI
DEPUTY FEDERAL PUBLIC DEFENDER
321 East 2nd Street
Los Angeles, California 90012
(213) 894-7571
Andrew_Talai@fd.org

*Counsel for Defendant-Appellee*
*Nathan Wilson*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................... 1

STATEMENT OF THE ISSUES ............................................................. 3

PROVISIONS INVOLVED ...................................................................... 3

STATEMENT OF THE CASE ................................................................. 3

    I.     Jurisdiction, Timeliness, and Bail Status ............................. 3

    II.    Facts and Proceedings Below ................................................. 4

          A.     The President and Attorney General blame "Antifa" and other "far left" activists for inciting violence during protests against racial injustice ........... 4

          B.     Wilson and Beasley are charged with federal arson for allegedly setting fire to a local police vehicle during a George Floyd protest in Los Angeles ............................................................................ 9

          C.     The district court declines to dismiss the indictment on selective prosecution grounds, but orders the government to produce discovery .............. 12

          D.     The district court denies reconsideration, but at the government's invitation, dismisses the indictment without prejudice to refiling ..................... 16

SUMMARY OF THE ARGUMENT ........................................................ 18

STANDARDS OF REVIEW ................................................................... 21

ARGUMENT ............................................................................................ 22

    I.     This Court Lacks Appellate Jurisdiction ............................ 22

          A.     The government has failed to establish appellate jurisdiction under 18 U.S.C. § 3731 .............................. 23

i

B.     The government has failed to establish any other basis for appellate jurisdiction ................................... 32

II.     The District Court Appropriately Exercised Its Discretion in Ordering Discovery ........................................ 39

    A.     The district court identified the correct legal standard for selective prosecution discovery .............. 39

    B.     The district court acted well within its discretion because there was "some evidence" to support selective prosecution discovery in this case ............... 47

        1.     The district court properly found that there was some evidence tending to show discriminatory effect ........................................... 48

        2.     The district court properly found that there was some evidence tending to show discriminatory intent ......................................... 57

CONCLUSION ........................................................................ 66

STATEMENT OF RELATED CASES

CERTIFICATE OF COMPLIANCE

ADDENDUM — PROVISIONS INVOLVED

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*United States ex rel. Alexander Volkhoff, LLC v. Janssen
    Pharmaceutica N.V.*,
    945 F.3d 1237 (9th Cir. 2020) ............................................................. 21

*Est. of Amos ex rel. Amos v. City of Page*,
    257 F.3d 1086 (9th Cir. 2001) ............................................................. 65

*Arizona v. Manypenny*,
    451 U.S. 232 (1981) ............................................................. 25, 26, 29

*Ave. 6E Invs., LLC v. City of Yuma*,
    818 F.3d 493 (9th Cir. 2016) ....................................................... 58, 61

*Bauman v. U.S. Dist. Ct.*,
    557 F.2d 650 (9th Cir. 1977) ....................................................... 38, 39

*Berger v. United States*,
    295 U.S. 78 (1935) ............................................................. 40

*Burlington N. & Santa Fe Ry. Co. v. U.S. Dist. Ct.*,
    408 F.3d 1142 (9th Cir. 2005) ............................................................. 38

*Carroll v. United States*,
    354 U.S. 394 (1957) ....................................................... 28, 29

*Cobbledick v. United States*,
    309 U.S. 323 (1940) ....................................................... 24, 25

*Cohen v. Beneficial Indus. Loan Corp.*,
    337 U.S. 541 (1949) ............................................................. 34

*Cooper v. Harris*,
    581 U.S. 285 (2017) ............................................................. 39

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
    140 S. Ct. 1891 (2020) ............................................................. 47

*Di Bella v. United States,*
369 U.S. 121 (1962)................................................................24, 29

*Digital Equip. Corp. v. Desktop Direct, Inc.,*
511 U.S. 863 (1994)................................................................34, 36

*Firestone Tire & Rubber Co. v. Risjord,*
449 U.S. 368 (1981)................................................................34, 36

*Flanagan v. United States,*
465 U.S. 259 (1984)................................................................24, 25

*Gomillion v. Lightfoot,*
364 U.S. 339 (1960)................................................................45

*Henderson ex rel. Henderson v. Shinseki,*
562 U.S. 428 (2011)................................................................21

*Int'l Bhd. of Teamsters v. United States,*
431 U.S. 324 (1977)................................................................45, 46

*Kerr v. U.S. Dist. Ct.,*
426 U.S. 394 (1976)................................................................38

*Kokkonen v. Guardian Life Ins. Co. of Am.,*
511 U.S. 375 (1994)................................................................23

*Lewis v. Casey,*
518 U.S. 343 (1996)................................................................31

*McGinest v. GTE Serv. Corp.,*
360 F.3d 1103 (9th Cir. 2004)................................................................61

*Miller v. Gammie,*
335 F.3d 889 (9th Cir. 2003) (en banc)................................................................38

*Mohawk Indus., Inc. v. Carpenter,*
558 U.S. 100 (2009)................................................................*passim*

*Newton v. Nat'l Broad. Co.,*
726 F.2d 591 (9th Cir. 1984) (per curiam)................................................................23

iv

*Noguera v. Davis,*
   5 F.4th 1020 (9th Cir. 2021) ............................................................. 33

*Oyler v. Boles,*
   368 U.S. 448 (1962) ......................................................................... 61

*Pers. Adm'r of Mass. v. Feeney,*
   442 U.S. 256 (1979) ......................................................................... 40

*Quackenbush v. Allstate Ins. Co.,*
   517 U.S. 706 (1996) ......................................................................... 23

*Regents of the Univ. of Cal. v. U.S. Dep't of Homeland Sec.,*
   908 F.3d 476 (9th Cir. 2018), *rev'd in part, vacated in part*
   *on other grounds sub nom. Dep't of Homeland Sec.*
   *v. Regents of the Univ. of Cal.,* 140 S. Ct. 1891 (2020) ...................... 46

*Reise v. Bd. of Regents,*
   957 F.2d 293 (7th Cir. 1992) ............................................................ 48

*Steel Co. v. Citizens for a Better Env't,*
   523 U.S. 83 (1998) ........................................................................... 31

*Swint v. Chambers Cnty. Comm'n,*
   514 U.S. 35 (1995) ........................................................................... 34

*United States v. Aguilar,*
   883 F.2d 662 (9th Cir. 1989), *superseded by statute on*
   *other grounds,* Immigration Reform and Control Act of
   1986, Pub. L. No. 99-603, 100 Stat. 3359, *as recognized in*
   *United States v. Gonzalez-Torres,* 309 F.3d 594 (9th Cir.
   2002) .............................................................. 50, 51, 53, 63

*United States v. Alameh,*
   341 F.3d 167 (2d Cir. 2003) ............................................................. 44

*United States v. Arenas-Ortiz,*
   339 F.3d 1066 (9th Cir. 2003) .......................................................... 41

*United States v. Armstrong*,
   48 F.3d 1508 (9th Cir. 1995) (en banc), *rev'd on other
   grounds*, 517 U.S. 456 (1996) ...................................................... *passim*

*United States v. Armstrong*,
   517 U.S. 456 (1996) ........................................................... *passim*

*United States v. Bass*,
   536 U.S. 862 (2002) (per curiam) .......................................... 55, 56, 57

*United States v. Ceja-Prado*,
   333 F.3d 1046 (9th Cir. 2003) ........................................................ 21

*United States v. Cruz*,
   554 F.3d 840 (9th Cir. 2009) ........................................................ 33

*United States v. DiFrancesco*,
   449 U.S. 117 (1980) ...................................................................... 25

*United States v. Falk*,
   479 F.2d 616 (7th Cir. 1973) (en banc) ......................................... 63

*United States v. Hinkson*,
   585 F.3d 1247 (9th Cir. 2009) (en banc) .......................... 22, 42, 50, 60

*United States v. Hollywood Motor Car Co.*,
   458 U.S. 263 (1982) ...................................................................... 24

*United States v. Jones*,
   159 F.3d 969 (6th Cir. 1998) .................................................... 42, 53

*United States v. Juv. Male*,
   670 F.3d 999 (9th Cir. 2012) ........................................................ 33

*United States v. Lucas*,
   841 F.3d 796 (9th Cir. 2016) ........................................................ 21

*United States v. MacDonald*,
   435 U.S. 850 (1978) ...................................................................... 29

*United States v. Marion*,
   404 U.S. 307 (1971) ...................................................................... 27

*United States v. Oakes,*
  11 F.3d 897 (9th Cir. 1993) .................................................................. 62

*United States v. Pace,*
  201 F.3d 1116 (9th Cir. 2000) ............................................................ 28

*United States v. Perez-Silvan,*
  861 F.3d 935 (9th Cir. 2017) ........................................................ 33, 38

*United States v. Ruiz,*
  536 U.S. 622 (2002) ............................................................................. 4

*United States v. Ryan,*
  402 U.S. 530 (1971) ........................................................................... 37

*United States v. Sanges,*
  144 U.S. 310 (1892) ........................................................................... 25

*United States v. Sellers,*
  906 F.3d 848 (9th Cir. 2018) ............................................................. 21

*United States v. Steele,*
  461 F.2d 1148 (9th Cir. 1972) ........................................... 52, 53, 62, 63

*United States v. Thorpe,*
  471 F.3d 652 (6th Cir. 2006) ............................................................. 44

*United States v. Turner,*
  104 F.3d 1180 (9th Cir. 1997) ........................................... 30, 31, 53, 54

*United States v. Williams,*
  68 F.4th 564 (9th Cir. 2023) ........................................................ 35, 36

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.,*
  429 U.S. 252 (1977) ................................................................... *passim*

*Wash. v. Seattle Sch. Dist. No. 1,*
  458 U.S. 457 (1982) ........................................................................... 61

*Washington v. Davis,*
  426 U.S. 229 (1976) ........................................................................... 41

*Wayte v. United States,*
    470 U.S. 598 (1985) ................................................................. *passim*

*Will v. Hallock,*
    546 U.S. 345 (2006) ........................................................................ 34

*Will v. United States,*
    389 U.S. 90 (1967) ......................................................................... 25

*Yick Wo v. Hopkins,*
    118 U.S. 356 (1886) ................................................................... 44, 45

**Constitutional Provisions**

U.S. Const. amend. I ............................................................. 8, 50, 59, 63

U.S. Const. amend. V .............................................................. 26, 29, 39

U.S. Const. amend. VI............................................................... 18, 25, 29

**Statutes**

18 U.S.C. § 844(i) .................................................................... 9, 11, 50

18 U.S.C. § 844(f) ......................................................................... *passim*

18 U.S.C. § 3231 .................................................................................. 3

18 U.S.C. § 3295 ................................................................................ 27

18 U.S.C. § 3731 ......................................................................... *passim*

28 U.S.C. § 1291 ......................................................................... *passim*

28 U.S.C. § 1292(b) ........................................................................... 28

28 U.S.C. § 1651(a) ..................................................................... 19, 38

28 U.S.C. § 2106 ............................................................................... 48

**Rules**

C.D. Cal. Civ. L.R. 7-18 ................................................................... 17

C.D. Cal. Crim. L.R. 57-1 ........................................................... 17

Fed. R. App. P. 4(b) .................................................................... 4

Fed. R. Crim. P. 12(b)(3) ........................................................... 12

## INTRODUCTION

This is a discovery appeal. During the summer of 2020, police officers killed a Black man named George Floyd and protests erupted across the nation. At the time, President Donald Trump and Attorney General William Barr publicly blamed "Antifa" and the "far left" for causing widespread civil unrest, while directing top prosecutors and law enforcement officials to target "anti-government" protesters and punish them more harshly than others. Nathan Wilson and Christopher Beasley were later charged with federal arson, in violation of 18 U.S.C. § 844(f), for allegedly setting fire to a local police vehicle during a local protest against racial injustice. That was so, even though over the previous 20 years there had been thousands of arsons in the community that could have been but were not federally prosecuted in the Central District of California.

Wilson moved to dismiss the indictment for selective prosecution in violation of the Fifth Amendment's equal protection component, and alternatively requested discovery on his claim. Beasley joined in the motion. The district court declined to dismiss the indictment but ordered selective prosecution discovery, subject to any assertions of the

deliberative process privilege. The government refused to comply and invited the court to dismiss the indictment without prejudice to refiling for the sole purpose of facilitating immediate appellate review.

This Court should dismiss the government's appeal for lack of jurisdiction. First, under 18 U.S.C. § 3731, the government does not have express authorization to appeal an adverse discovery ruling in a criminal case. And this Court should not allow the appeal of a discovery order under the guise of a dismissal order that was not entered as a genuine sanction. Second, under 28 U.S.C. § 1291, a discovery ruling is not a "final decision" and cannot be immediately appealed under the collateral order doctrine. Nor has the government asserted any other basis for appellate jurisdiction, such as the mandamus statute.

If, however, this Court concludes that appellate jurisdiction is proper, it should affirm the district court's discovery ruling. First, contrary to the government's assertion, the court identified the correct legal standard for discovery on a selective prosecution claim. It clearly understood that, to obtain such discovery, Wilson had to produce "some evidence" tending to show both discriminatory effect and discriminatory intent. There was no legal error here. Second, because Wilson did in fact

2

proffer such evidence, the court was well within its discretion to permit discovery. Its ruling was not illogical, implausible, or unsupported by the record, and the government has failed to show otherwise.

## STATEMENT OF THE ISSUES

1. Whether this Court lacks appellate jurisdiction, where the government solicited a consequence-free dismissal of the indictment to manufacture review of an interlocutory order that Congress did not expressly make appealable under 18 U.S.C. § 3731.

2. Whether the district court properly exercised its discretion in ordering selective prosecution discovery, where Wilson—joined by Beasley—came forward with "some evidence" tending to show the existence of both discriminatory effect and discriminatory intent.

## PROVISIONS INVOLVED

Pertinent constitutional and statutory provisions are reproduced in an addendum to this brief.

## STATEMENT OF THE CASE

### I. Jurisdiction, Timeliness, and Bail Status

The district court had original jurisdiction under 18 U.S.C. § 3231. Wilson and Beasley contend that the government's appeal is not authorized under 18 U.S.C. § 3731, and that appellate jurisdiction is

otherwise lacking under 28 U.S.C. § 1291. *See infra* at pp. 22–39. This Court has "jurisdiction to determine its own jurisdiction." *United States v. Ruiz*, 536 U.S. 622, 628 (2002).

On August 12, 2022, the district court ordered the government to produce selective prosecution discovery. 1-ER-12–31.[1] On December 21, 2022, the court denied the government's motion for reconsideration of the discovery ruling, dismissed the indictment without prejudice to refiling, and entered judgment to that effect. 1-ER-3, 4–11. On January 19, 2023, the government filed a timely notice of appeal under Federal Rule of Appellate Procedure 4(b)(1)(B)(i). 2-ER-306.

Wilson and Beasley are not in custody.

## II.   Facts and Proceedings Below

### A.   The President and Attorney General blame "Antifa" and other "far left" activists for inciting violence during protests against racial injustice.

In May 2020, a Black man named George Floyd was killed while in police custody. Americans across the country gathered together that

---

[1] "GOB" refers to Government's Opening Brief (Dkt. 17) and is followed by applicable page numbers. "ER" refers to Excerpts of Record (Dkt. 18) and is preceded by applicable volume numbers and followed by applicable page numbers. "SER" refers to Supplemental Excerpts of Record and is followed by applicable page numbers.

summer to protest racial injustice. One such protest occurred on May 31, 2020, in Los Angeles, California, less than a week after Floyd had been murdered by law enforcement officers. 1-ER-12. The government alleges that, during this protest, Wilson and Beasley set fire to a local police vehicle. 2-ER-304–05.

President Donald Trump and Attorney General William Barr made several public statements in response to widespread civil unrest associated with the George Floyd protests. 1-ER-12–15. As reported at the time, the President and Attorney General placed blame on a group known as "Antifa," along with other "far left" activists. ER-13.

For example, on May 30, 2020, Attorney General Barr issued a press release in which he claimed the "protests [had been] hijacked by violent radical elements," and that "[g]roups of outside radicals and agitators are exploiting the situation to pursue their own separate and violent agenda." 1-ER-12–13. He stated that, "[i]n many places, it appears the violence is planned, organized, and driven by anarchistic and far left extremists, using Antifa-like tactics." 1-ER-13. He also declared that the "Department of Justice . . . [,] and all of [its] 93 U.S.

Attorneys across the country, will . . . take all action necessary to enforce federal law." *Id.*

On May 31, 2020, the date of the protest at issue here, Attorney General Barr issued a similar press release. 1-ER-13. In it, he pledged that "[f]ederal law enforcement actions will be directed at apprehending and charging the violent radical agitators who have hijacked peaceful protest and are engaged in violations of federal law." *Id.* He also asserted that "[t]he violence instigated and carried out by Antifa and other similar groups in connection with the rioting is domestic terrorism and will be treated accordingly." *Id.*

Similarly, on June 1, 2020, President Trump claimed during a speech that "our nation has been gripped by professional anarchists, violent mobs, arsonists, looters, criminals, rioters, Antifa, and others." 1-ER-13. Speaking directly to "the organizers of this terror," which he once again deemed to include "[A]ntifa," the President announced in stark terms: "[Y]ou will face severe criminal penalties and lengthy sentences in jail." *Id.*

That same day, President Trump and Attorney General Barr held a conference call with state governors across the nation. 1-ER-13–14.

6

During this call, the Attorney General explained that, in "most places, you have this ingredient of extremist anarchist agitators," and promised that law enforcement would "go after the guys that are throwing the bricks and . . . running around starting fires." *Id.* On the same call, the President announced he was going to "activate Bill Barr and activate him very strongly." 1-ER-14. He specifically referenced "what went on . . . in Los Angeles," describing the events as "terrible." *Id.* The President called for "[t]otal domination," declaring the need to "arrest these people and . . . judge them," while forbidding lenient treatment like a supposed "deal where they get one week in jail." *Id.* He claimed that the source of this civil unrest was clear: "They're Antifa and they're radical left." *Id.*

By the end of the month, on June 26, 2020, Attorney General Barr issued a memorandum to all U.S. Attorneys. 1-ER-14. In this document, the Attorney General insisted that "anti-government violent extremists . . . will pose continuing threats of lawlessness," and that he was consequently creating a "task force devoted to countering violent anti-government extremists." *Id.* He further explained that the task force

7

would provide resources for helping to prosecute "violent acts by anti-government extremists." *Id.*

Over a month later, on August 9, 2020, Attorney General Barr clarified his views during a television appearance. 1-ER-14. He explained that Antifa is "a revolutionary group that is interested in some form of socialism [or] communism." *Id.* He asserted that "[t]hey're essentially Bolsheviks," and that "[t]heir tactics are [f]ascist[ic]." *Id.* According to the Attorney General, Antifa was engaged in "a new form of urban guerrilla warfare." *Id.* He suggested that "they are essentially shielding themselves or shrouding themselves in First Amendment activity," and that "they hijack these demonstrations and they provoke violence." *Id.*

Finally, by September 2020, Attorney General Barr held a conference call with U.S. Attorneys across the country. 1-ER-14–15. During this call, the Attorney General directed top federal prosecutors to "be aggressive when charging violent demonstrators with crimes,"

and further "encouraged them to seek a number [of] federal charges

. . . even when state charges could apply." *Id.*[2]

> **B.    Wilson and Beasley are charged with federal arson for allegedly setting fire to a local police vehicle during a George Floyd protest in Los Angeles.**

Federal arson can be charged under 18 U.S.C. §§ 844(f) or (i). Each

subsection has a different jurisdictional element—one covers property

in which the government has a possessory or pecuniary interest, 18

U.S.C. § 844(f), while the other covers property used in or affecting

interstate or foreign commerce, *id.* § 844(i). But both subsections punish

"[w]hoever maliciously damages or destroys, or attempts to damage or

destroy, by means of fire or an explosive, any building, vehicle, or other"

personal or real property. *Id.* §§ 844(f), (i).

In October 2020, a grand jury in the Central District of California

returned an indictment against Wilson and Beasley. 2-ER-304–05. They

were charged with one count of arson under § 844(f)(1). This provision

carries a five-year mandatory minimum sentence, which increases to

seven years if the offense "creates a substantial risk of injury to any

---

[2] The government did not dispute the content of these statements nor did it raise any evidentiary objections to their consideration before the district court. *See* 1-ER-13; 2-ER-72–74.

person." 18 U.S.C. § 844(f)(2). The indictment alleged that, on May 31, 2020, Wilson and Beasley set fire to a Santa Monica Police Department vehicle and created a substantial risk of injury to at least one person. 2-ER-305. It also alleged that the vehicle was owned by the City of Santa Monica, which receives federal financial assistance. 2-ER-304.[3]

Despite a prevalence of reported arson cases, federal arson prosecutions have been relatively infrequent in the Central District of California. 1-ER-18–20. For example, from 2010 to 2019, there were an average of 3,500 reported arsons per year within the seven counties that make up the Central District. 1-ER-19; *see also* 2-ER-174–78 (California crime statistics). From 2016 to 2020, there were over 2,000 arsons in the City of Los Angeles alone. 1-ER-20; *see also* 2-ER-179–199 (Los Angeles crime statistics). And from 2016 to 2019, federal law enforcement tracked and documented over 1,000 arsons within the counties that comprise the Central District. 1-ER-20; *see also* 2-ER-254–69 (federal crime statistics). Yet over the past 20 years, the U.S.

---

[3] Over a year later, in March 2022, the grand jury returned a first superseding indictment against Wilson and Beasley. SER-30–31. This time, it charged them with only attempt to commit federal arson under § 844(f)(1). *Id.*

Attorney's Office for the Central District of California ("USAO") has

brought only 15 cases alleging violations of §§ 844(f) or (i). 1-ER-18; *see*

*also* 2-ER-167–173 (federal case reports). In the last 10 years, there

have been only six cases that included a federal arson charge—and of

those six, four were related to the George Floyd protests. *Id.*[4]

Wilson requested discovery from the government relevant to a

possible selective prosecution claim. 1-ER-15. Among other things, he

asked for: (1) a list of all cases in which USAO charged violations of

§§ 844(f) and (i) in the last four years; (2) an explanation of the criteria

used by USAO when deciding whether to file such charges; (3) all

communications related to the decision to prosecute Wilson, including

those between USAO and local prosecutors or law enforcement officers;

and (4) all communications related to the decision to prosecute cases

related to civil unrest associated with the George Floyd protests,

including between USAO and the Department of Justice. *Id.*; *see also* 2-

ER-287–89 (pertinent discovery requests). The government refused to

provide any such discovery. 1-ER-15.

---

[4] The government did not dispute the accuracy of these statistics nor did it raise any evidentiary objections to their consideration before the district court. *See* 1-ER-22–24; 2-ER-76–80.

11

C.   **The district court declines to dismiss the indictment on selective prosecution grounds, but orders the government to produce discovery.**

Wilson moved to dismiss the indictment for selective prosecution, or alternatively, to compel discovery on his claim. 2-ER-136–66; *see also* Fed. R. Crim. P. 12(b)(3)(A)(iv). Beasley joined in the motion. SER-48. Wilson argued that the government had unconstitutionally targeted him for prosecution because he appeared to hold and espouse "anti-government" views and was associated with the George Floyd protests. 2-ER-155. Among other things, Wilson presented statistical evidence showing there had been thousands of similar arsons over the preceding two decades that could have been but were not federally prosecuted in the Central District of California. 2-ER-156–59. He also pointed to the contemporaneous statements made by President Trump and Attorney General Barr indicating a desire to single out and more harshly punish certain "anti-government" activists. 2-ER-159–63. At a minimum, Wilson sought discovery because he had proffered at least some direct and circumstantial evidence tending to show the existence of discriminatory effect and intent. 2-ER-163–65.

12

The government opposed. 2-ER-59–82. It argued that Wilson had failed to prove both discriminatory effect and intent on the merits of his claim. 2-ER-71–80. And for similar reasons, the government insisted that selective prosecution discovery was not justified. 2-ER-80–81. It further objected to producing information protected by the deliberative process privilege. 2-ER-81–82.

Wilson filed a reply, in which he maintained that the government improperly decided to prosecute him for his "imputed anti-government views." SER-36. In response to the government's claim that there was no discriminatory intent, Wilson reiterated that such invidious purpose is evident from the public record. SER-37–42. And to counter the government's assertion that there was no discriminatory effect, he explained that numerous of arson cases in the district that could have been brought federally were not. SER-43–44. Wilson also argued that the evidence was enough to at least justify discovery, which could "alleviate any doubts about why the government charged [him] here." SER-37; *see also* SER-44–46.

The district court was not prepared to dismiss the indictment for selective prosecution and instead ordered the government to produce

discovery. 1-ER-12–31. The court instructed the parties to meet and confer on the government's deliberative process privilege objections, and also ordered the government to create a privilege log. 1-ER-30–31.[5]

The district court first found that Wilson had put forth "some evidence" tending to show discriminatory effect. 1-ER-20–24. The court determined that Wilson's proposed comparator group was suitable because it isolated the factor that distinguished his prosecution from other arson cases within the Central District of California: his perceived "anti-government" views and association with the George Floyd protests. 1-ER-20–23. The court then reviewed the statistical evidence, which showed that the government was aware of many similar arsons—including of vehicles, businesses, and buildings—that could have been but were not prosecuted in the Central District. 1-ER-23–24.

The district court next found that Wilson had provided "some evidence" tending to show that discriminatory intent was a motivating

---

[5] The government did not provide a copy of its response to Wilson's discovery requests nor did its opposition contain objections "on any ground other than the deliberative process privilege." 1-ER-31; *see also* 2-ER-80–82. It therefore appeared to the district court as though the government had "waived all [other] objections to the discovery requests." 1-ER-31.

factor in the prosecution. 1-ER-24–30. It concluded that the federal government could not permissibly single out individuals who were associated with the George Floyd protests and were believed to hold "anti-government" views. 1-ER-25–26. It observed that Attorney General Barr's task force memorandum, coupled with his prosecutorial directive to U.S. Attorneys across the country, constituted some evidence of a discriminatory federal policy. 1-ER-26–28. The court also noted President Trump's and Attorney General Barr's contemporaneous public statements, including their conference call with the nation's governors, which provided some evidence of their retaliatory thinking. 1-ER-28–29.

In sum, after assessing the evidence and arguments from each side, the district court concluded that Wilson had "presented more than some evidence tending to show the existence of . . . discriminatory effect and discriminatory intent." 1-ER-30 (internal quotation marks omitted). It based this determination on Wilson's presentation of "specific facts, not mere allegations, which establish a colorable basis for the existence of both discriminatory application of a law and discriminatory intent on the part of government actors." *Id.*

15

**D.    The district court denies reconsideration, but at the government's invitation, dismisses the indictment without prejudice to refiling.**

The government sought reconsideration. 2-ER-34–58. It once again argued that Wilson and Beasley were not entitled to selective prosecution discovery, but alternatively urged the district court to dismiss the indictment without prejudice to refiling. 2-ER-42–58; SER-5–14. The government stated its intent to defy the court's discovery ruling and take an appeal. 2-ER-57–58; SER-12–13. It claimed that dismissal of the indictment, rather than a finding of contempt, would facilitate "expeditious[]" review without "additional rigmarole." SER-6; *see also* SER-13 (government suggesting dismissal would "trigger appellate review" with less "time and spectacle").

Wilson and Beasley opposed reconsideration. SER-19–28. They first showed that the government was improperly "rehash[ing]" arguments that the district court had already rejected. SER-21–25; *see also* SER-29 (defense chart showing the government's repetition of arguments). In addition, they objected to the government's alternative request for dismissal. SER-25–27. Wilson and Beasley explained that the government was trying to "subvert the rules" and "recast an

unappealable discovery order as an appealable order dismissing the indictment." SER-26. The proper course of action, they argued, was to instead order the government to "show cause as to why it should not be held in contempt." *Id.*

The district court denied reconsideration. 1-ER-4–11. Under the local rules, "[n]o motion for reconsideration may in any manner repeat any oral or written argument made in support of, or in opposition to, the original motion." C.D. Cal. Civ. L.R. 7-18; *see also* C.D. Cal. Crim. L.R. 57-1 (applicability of local civil rules to criminal cases). The court determined that the government had "ignore[d] this admonition," simply reargued its position, and failed to offer a basis for withdrawal of the order. 1-ER-6–10. The court then asserted, at the government's behest and without any analysis of the appropriate sanction, that it saw "no point in going through the process of holding the government in contempt in order to provide it with the basis for an appealable order." 1-ER-10 (citing government's reply).

The district court dismissed the indictment against Wilson and Beasley "without prejudice subject to refiling, if appropriate, at a later time." 1-ER-10. The court entered judgment accordingly. 1-ER-3.

## SUMMARY OF THE ARGUMENT

I.  This Court lacks appellate jurisdiction under 18 U.S.C. § 3731 and 28 U.S.C. § 1291, and the government has not invoked any other source of jurisdiction. This Court should dismiss the appeal.

A.  The government has not established appellate jurisdiction under § 3731. It cannot appeal in criminal cases without statutory authorization, and § 3731's list of appealable orders does not expressly include adverse discovery rulings. This Court should not allow the government to disobey a discovery order and solicit dismissal of the indictment as a way of manufacturing immediate review—at least not without facing genuine consequences if it loses. Congress alone has the power to permit departures from the historic practice of disfavoring government criminal appeals, and it has not explicitly done so here. Moreover, giving the government free reign to seek appellate review of any pretrial order with which it disagrees would denigrate the speedy trial right and could transform criminal appeals into an instrument of undue delay and improper harassment.

B.  The government has also failed to establish jurisdiction under § 1291. This Court's jurisdiction is generally limited to appeals from

"final decisions," and discovery rulings are widely understood to be non-final. Although § 1291 permits immediate appeal of certain collateral orders, discovery rulings do not belong to this narrow class of decisions. In addition, the government has neither petitioned for mandamus relief under 28 U.S.C. § 1651(a) nor requested that its notice of appeal be so construed. Regardless, the "extraordinary remedy" of mandamus is not warranted here because, among other things, the district court's discovery ruling was not clearly erroneous as a matter of law.

II.  If this Court has jurisdiction, it should conclude that the district court appropriately exercised its discretion in ordering selective prosecution discovery. The court identified the correct legal standard, and it found "some evidence" tending to show discriminatory effect and discriminatory intent. This Court should affirm.

A.  The Fifth Amendment's equal protection component prohibits the federal government from deliberately prosecuting someone based on an arbitrary classification, including based on the exercise of protected statutory and constitutional rights. To obtain discovery on a selective prosecution claim, the defendant must offer "some evidence" tending to show the existence of discriminatory effect and discriminatory intent.

19

The district court correctly identified the governing legal standard, and it accurately characterized the showing necessary to secure discovery in aid of such a claim. It did not commit legal error.

B.  The district court appropriately exercised its discretion in ordering discovery because it found "some evidence" tending to support both prongs of a selective prosecution claim. First, as to discriminatory effect, Wilson presented data showing that there had been thousands of similar arsons over the preceding 20 years that could have been but were not federally prosecuted in the Central District of California. Second, as to discriminatory intent, he provided contemporaneous public statements from President Trump and Attorney General Barr indicating a desire to target and more harshly punish those believed to hold "anti-government" views and associated with the George Floyd protests. The government did not challenge the accuracy or reliability of these specific facts, and the district court correctly found that they amounted to at least "some evidence" of disparate treatment and a discriminatory purpose. Moreover, contrary to the government's assertions, the district court did not select an improper control group or rely on impermissibly generic data. The government is also wrong to

suggest that Wilson and Beasley's alleged offenses were not associated with protected conduct or that both men somehow needed to prove they actually held unpopular political views.

## STANDARDS OF REVIEW

This Court has an "independent obligation" to ensure that it does not exceed the scope of its own jurisdiction. *Henderson ex rel. Henderson v. Shinseki*, 562 U.S. 428, 434 (2011); *see also United States v. Ceja-Prado*, 333 F.3d 1046, 1051 (9th Cir. 2003) ("Nothing is to be more jealously guarded by a court than its jurisdiction."). This Court reviews whether it has appellate jurisdiction de novo. *United States ex rel. Alexander Volkhoff, LLC v. Janssen Pharmaceutica N.V.*, 945 F.3d 1237, 1241 (9th Cir. 2020).

This Court generally reviews a district court's discovery rulings for abuse of discretion. *United States v. Lucas*, 841 F.3d 796, 803 (9th Cir. 2016). The same standard applies when reviewing a ruling on selective prosecution discovery. *United States v. Sellers*, 906 F.3d 848, 851–52 (9th Cir. 2018). This Court will not find an abuse of discretion unless it has "a definite and firm conviction that the district court committed a clear error of judgment." *Lucas*, 841 F.3d at 803. The abuse

of discretion test is "significantly deferential," and this Court will affirm unless the district court identified the wrong legal standard or applied the correct legal standard in a way that is "illogical, implausible, or without support in inferences that may be drawn from the record." *United States v. Hinkson*, 585 F.3d 1247, 1261–63 (9th Cir. 2009) (en banc).

## ARGUMENT

## I. **This Court Lacks Appellate Jurisdiction.**

This Court lacks jurisdiction over the government's appeal. First, Congress has not expressly authorized the government to appeal an adverse discovery ruling under 18 U.S.C. § 3731. And the government should not be permitted to transform a quintessentially non-appealable order into an appealable one by flouting the district court's ruling and soliciting a risk-free sanction. Second, a discovery ruling cannot be appealed under 28 U.S.C. § 1291 and the collateral order doctrine, nor has the government invoked any other basis for appellate jurisdiction. Accordingly, this Court should dismiss the appeal.

**A.** **The government has failed to establish appellate jurisdiction under 18 U.S.C. § 3731.**

1. Federal courts are courts of "limited jurisdiction." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). Their power extends only as far as authorized by the Constitution and statutes; it cannot be "expanded by judicial decree." *Id.* Cases presumptively fall "outside this limited jurisdiction," and the burden of proving otherwise rests with "the party asserting jurisdiction." *Id.*

Generally, this Court's jurisdiction is limited to appeals from "final decisions" of the district courts. 28 U.S.C. § 1291. A decision is considered final if it "ends the litigation on the merits and leaves nothing for the court to do but execute the judgment." *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 712 (1996). The default rule is thus that "a party is entitled to a single appeal, to be deferred until final judgment has been entered, in which claims of district court error at any stage of the litigation may be ventilated." *Id.* And interlocutory orders—like discovery rulings—that do not resolve the entire case are not immediately appealable. *Newton v. Nat'l Broad. Co.*, 726 F.2d 591, 592 (9th Cir. 1984) ("[T]he general rule is that an order regarding discovery is not an appealable final order.") (per curiam).

23

Finality as a prerequisite to review is a "historic characteristic" of federal appellate jurisdiction. *Cobbledick v. United States*, 309 U.S. 323, 324 (1940). The final decision rule was "written into the first Judiciary Act and has been departed from only when observance of it would practically defeat the right to any review at all." *Id.* at 324–25 (footnote omitted). And for good reason: it "preserve[s] the respect due trial judges by minimizing appellate-court interference with the numerous decisions they must make in the pre-judgment stages of litigation," "reduces the ability of litigants to harass opponents and to clog the courts through a succession of costly and time-consuming appeals," and promotes "the efficient administration of justice." *Flanagan v. United States*, 465 U.S. 259, 263–64 (1984). Accordingly, the Supreme Court has long recognized that "the policy of Congress embodied in [§ 1291] is inimical to piecemeal appellate review of trial court decisions which do not terminate the litigation." *Id.* at 264.

The same goes for criminal cases. If anything, this policy is "at its strongest in the field of criminal law." *United States v. Hollywood Motor Car Co.*, 458 U.S. 263, 265 (1982); *see also Di Bella v. United States*, 369 U.S. 121, 124 (1962) (stating that piecemeal appeals are "particularly

damaging to the conduct of criminal cases"); *Cobbledick*, 309 U.S. at 325 (explaining that finality considerations are "especially compelling in the administration of criminal justice"). Among other reasons, the final decision rule "takes on added weight in criminal cases" because the accused is "entitled to a speedy resolution of the charges against him." *Will v. United States*, 389 U.S. 90, 96 (1967); *see also Flanagan*, 465 U.S. at 263–65 (explaining that the final decision rule serves "important interests" in criminal cases, including the accused's right to a speedy trial, the government's interest in avoiding delays that make it more difficult to meet its high burden of proof, and society's interest in swiftly bringing offenders to justice).

2. The government cannot take an appeal in a criminal case without express statutory authorization. *United States v. Sanges*, 144 U.S. 310, 322–23 (1892); *see also United States v. DiFrancesco*, 449 U.S. 117, 131 (1980) ("The United States 'has no right of appeal in a criminal case, absent explicit statutory authority.'"). Thus, in federal practice, "appeals by the Government in criminal cases, are something unusual, exceptional, [and] not favored." *Arizona v. Manypenny*, 451 U.S. 232, 245 (1981). This policy "has deep roots in the common law, for it was

generally understood, at least in this country, that the sovereign had no right to appeal an adverse criminal judgment unless expressly authorized by statute to do so." *Id.*

Section 3731 provides, as relevant here, that the government may appeal "from a decision, judgment, or order of a district court dismissing an indictment or information . . . , except that no appeal shall lie where the double jeopardy clause of the United States Constitution prohibits further prosecution." 18 U.S.C. § 3731. There are certain traditionally non-final orders enumerated in this statute: for example, the government can appeal orders suppressing or excluding evidence or requiring return of seized property, if "the United States attorney certifies to the district court that the appeal is not taken for purpose of delay and that the evidence is a substantial proof of a fact material in the proceeding." *Id.*

Section 3731 does not expressly authorize the government to appeal an adverse discovery ruling, nor does it expressly create a procedural mechanism for the government to seek discretionary review of otherwise non-appealable orders. The question, then, becomes whether the government may invite dismissal of an indictment—

26

without facing any genuine consequence—as a gateway to review of an otherwise non-appealable order that is not specifically listed in § 3731.

The answer should be no. If the Court were to find that jurisdiction is proper under these circumstances, the government would be free to proceed with the prosecution whether or not the dismissal order (and thus the underlying discovery ruling) is affirmed. That is, this Court's decision will have no practical impact on whether the prosecution goes forward here. *See United States v. Marion*, 404 U.S. 307, 312 (1971) (finding appellate jurisdiction when basis for dismissal "was beyond the power of the Government to cure since re-indictment would not have been permissible under such a ruling"). So long as it complies with the relevant statute of limitations, *see* 18 U.S.C. § 3295 (10 years for federal arson cases), the government would be able to go back to the grand jury, get another indictment on the same charges, and belatedly comply with the discovery ruling if the district court were to impose it again. Section 3731 should not be reduced to a heads-prosecutor-wins-tails-defendant-loses proposition.

Congress undoubtedly could have written a statute authorizing any constitutionally permissible government appeal, or it could have

enacted a novel statutory provision allowing the government to pursue

discretionary review of otherwise non-appealable orders—something

akin to 28 U.S.C. § 1292(b) in civil cases. But it did neither. *See Carroll*

*v. United States*, 354 U.S. 394, 407 (1957) ("[I]t is the function of the

Congress to decide whether to initiate a departure from the historical

pattern of restricted appellate jurisdiction in criminal cases."). And if

Congress wants to expressly authorize such review, contrary to the

historic policy disfavoring government appeals in criminal cases, it

knows how to do so and should speak clearly. *Id.* at 415 (requiring a

"much clearer mandate" before permitting appeals that are not plainly

authorized by statute). It is not this Court's function to enact, in all but

name, the criminal-law equivalent of § 1292(b). Whatever the benefits

or downsides of such a provision might be, Congress has not yet made

that policy judgment. *See United States v. Pace*, 201 F.3d 1116, 1119

(9th Cir. 2000) ("[S]ection 1292(b) certifications cannot confer

interlocutory appellate jurisdiction in criminal prosecutions.").

Moreover, permitting the government to manufacture review in

this way would raise serious constitutional and prudential problems.

The government could transform any adverse pretrial order—not just a

28

discovery ruling—into an appealable one by simply refusing to abide by it and coaxing the district court into dismissing the indictment without facing any real consequences. Obviously, a rule giving the government *carte blanche* to seek appellate review of any pretrial order would raise speedy trial concerns. *See United States v. MacDonald*, 435 U.S. 850, 861 (1978) ("Fulfillment of [the Sixth Amendment's speedy trial] guarantee would be impossible if every pretrial order were appealable."). And not only would such a rule encourage jurisdictional gamesmanship, but it would undermine the historic reasons for disfavoring government appeals in criminal cases absent express statutory authorization. *See DiBella*, 369 U.S. at 130 (explaining that the policy against government appeals in criminal cases has a basis "over and above the constitutional protection against double jeopardy"). In particular, the government could pursue risk-free appeals for the improper purpose of delay or harassment—while possible charges remain hanging over the accused's head for years. *See Manypenny*, 451 U.S. at 246 ("The need to restrict appeals by the prosecutor reflected a prudential concern that individuals should be free from the harassment and vexation of unbounded litigation by the sovereign."); *Carroll*, 354

U.S. at 415 ("Delays in the prosecution of criminal cases are numerous and lengthy enough without sanctioning appeals that are not plainly authorized by statute.").

3.  The government asserts that appellate jurisdiction "plainly lies" under § 3731. GOB 19–20 n.4. It cites two cases—*United States v. Armstrong*, 517 U.S. 456 (1996), and *United States v. Turner*, 104 F.3d 1180 (9th Cir. 1997)—as establishing a "procedure" by which the government may solicit dismissal of an indictment to secure appellate review of an adverse discovery ruling (and presumably any other pretrial order) with which it does not wish to comply. GOB 19. But the government's cited cases do not explicitly sanction such a procedural maneuver.

To be sure, *Armstrong* and *Turner* appear to have assumed jurisdiction to review discovery orders vis-à-vis dismissal of an indictment. These decisions, though, either fail to address jurisdiction at all or lack any reasoned analysis of the jurisdictional issue. For example, in *Armstrong*, the Supreme Court said nothing about the propriety of appellate jurisdiction. *See* 517 U.S. at 461 n.2 (simply commenting "it was the government itself that suggested dismissal of

the indictments to the district court so that an appeal might lie"). Likewise, in *Turner*, this Court engaged in no meaningful analysis of finality or appellate jurisdiction. *See* 104 F.3d at 1184 (simply stating that "[t]he government appeal[ed]"). It is well settled that courts may not read jurisdictional holdings into decisions, like those cited by the government, that do not address jurisdiction. *Lewis v. Casey*, 518 U.S. 343, 352 n.2 (1996) ("[W]e have repeatedly held that the existence of unaddressed jurisdictional defects has no precedential effect."); *cf. Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998) (declining to endorse the hypothetical jurisdiction doctrine "because it carries the courts beyond the bounds of authorized judicial action and thus offends fundamental principles of separation of powers"). Thus, *Armstrong* and *Turner* neither serve as precedent nor provide specific guidance on the jurisdictional issue presented here.

If anything, there is good reason to think that the dismissal order in *Armstrong*—unlike the one here—was in fact treated as a genuine sanction. As the en banc Court explained, jurisdiction was proper only because "the government knowingly accepted the consequence of opting for an immediate appeal rather than complying with the discovery

order." *United States v. Armstrong*, 48 F.3d 1508, 1510 (9th Cir. 1995) (en banc), *rev'd on other grounds*, 517 U.S. 456 (1996). In other words, the consequence was real—if affirmed, "the dismissal of the indictments must . . . be implemented." *Id.* It was "too late for the government to change its mind and comply with the discovery order," as this Court was unwilling to "permit[] appeals of discovery orders *under the guise of dismissal orders* that were either only tentative or were never intended to take effect." *Id.* (emphasis added). That is, if the dismissal was not a true sanction for the government's defiance of the discovery ruling, this Court "would not have jurisdiction over the appeals under § 3731." *Id.* At bottom, and in contrast to the circumstances here, the government did not have a consequence-free appeal in *Armstrong*: it could not have re-indicted the defendants and belatedly complied with the discovery order in the event of an appellate loss.

**B.    The government has failed to establish any other basis for appellate jurisdiction.**

1.  The government also speculates, in a footnote, that this Court "may" have jurisdiction over an appeal from the discovery order itself under § 1291 and the collateral order doctrine. GOB 19 n.4. It cites only one case, without much elaboration, for the purportedly analogous

proposition that an order disqualifying a prosecutor is immediately appealable as a collateral order. *Id.* (citing *United States v. Williams*, 68 F.4th 564 (9th Cir. 2023)). That is wrong.

As an initial matter, this Court should require more before considering the government's argument. A party waives issues not "argued specifically and distinctly" in its opening brief. *United States v. Perez-Silvan*, 861 F.3d 935, 938 (9th Cir. 2017). In "[a]pplying this standard," the Court has "refused to address claims that were only 'argue[d] in passing' or that were 'bare assertion[s] . . . with no supporting argument.'" *United States v. Juv. Male*, 670 F.3d 999, 1015 (9th Cir. 2012); *see also Noguera v. Davis*, 5 F.4th 1020, 1029 n.3 (9th Cir. 2021) ("The summary mention of an issue in a footnote, without reasoning in support of the [party's] argument, is insufficient to raise the issue on appeal."). The Court enforces this rule "with some vigor against criminal defendants," so it "should be no less vigorous in applying it against the government." *United States v. Cruz*, 554 F.3d 840, 848 (9th Cir. 2009).

Regardless, the collateral order doctrine does not apply here. This doctrine is not an exception to the "final decision" rule, but rather a

practical construction of it. *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 546 (1949). The Supreme Court has recognized that § 1291 covers a "small class" of collateral rulings that do not "terminate an action" but are still considered "final." *Id.* at 545–46; *see also Will v. Hallock*, 546 U.S. 345, 350 (2006) (insisting that the class of collaterally appealable orders remains "narrow and selective in its membership"). This includes "only decisions that are [1] conclusive, that [2] resolve important questions separate from the merits, and that are [3] effectively unreviewable on appeal from the final judgment in the underlying action." *Swint v. Chambers Cnty. Comm'n*, 514 U.S. 35, 42 (1995); *see also Digital Equip. Corp. v. Desktop Direct, Inc.*, 511 U.S. 863, 868 (1994) (describing the conditions for a collateral order appeal as "stringent").

Discovery rulings do not belong to this small class of orders. *See Firestone Tire & Rubber Co. v. Risjord*, 449 U.S. 368, 377 (1981) ("[W]e have generally denied review of pretrial discovery orders."). For example, in *Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100 (2009), the Supreme Court held that an order compelling discovery of information protected by the attorney-client privilege—one of the "oldest" privileges

34

for confidential communications, which serves "broader public interests in the observance of law and administration of justice"—was not appealable under the collateral order doctrine. *Id.* at 108. Despite recognizing the "importance" of the interest at stake, the Court explained that "collateral order appeals are not necessary to ensure effective review of orders adverse to the attorney-client privilege." *Id.* Indeed, several alternative paths to appellate review of discovery rulings are available, such as contempt proceedings or mandamus petitions. *Id.* at 110–12. And routine appealability of discovery orders would disrupt litigation, swamp the appellate courts, and substantially reduce the lower courts' ability to control discovery. *Id.* at 112–13.

The government's fleeting reference to *Williams* is not helpful. GAB 19 n.4. In that case, this Court held that "disqualification of an entire U.S. Attorney's Office warrants immediate appellate review under the collateral order doctrine." *Williams*, 68 F.4th at 571 (explaining that the district court disqualified 180 federal prosecutors in the District of Arizona based on the alleged professional misconduct of one Assistant U.S. Attorney). In particular, as to the third collateral order factor, this Court found that the disqualification order was

"effectively unreviewable" and could not be "remedied on appeal" after a final judgment on the merits of defendants' criminal charges. *Id.* at 570 (explaining that an acquittal would bar the government from appealing or re-prosecuting due to double jeopardy, while a guilty plea or guilty verdict would make an appeal unlikely since the government will have ultimately prevailed).

The same is not true for discovery rulings, which are plainly in a different class than disqualification orders. *See Digital Equip.*, 511 U.S. at 868 (focusing collateral order determination on "the entire category to which a claim belongs," regardless of the chance that a "particular injustic[e]" might be averted by immediate appellate review). Moreover, it is well settled that discovery rulings are subject to appellate review through both contempt and mandamus proceedings. *See Firestone*, 449 U.S. at 377 ("[I]n the rare case when appeal after final judgment will not cure an erroneous discovery order, a party may defy the order, permit a contempt citation to be entered against him, and challenge the order on direct appeal of the contempt ruling."); *Mohawk Indus.*, 558 U.S. at 111 ("[I]n extraordinary circumstances—*i.e.,* when a disclosure order 'amount[s] to a judicial usurpation of power or a clear abuse of

discretion,' or otherwise works a manifest injustice—a party may petition the court of appeals for a writ of mandamus.").

Although it preferred not to (SER-6, 13), the government could have easily followed the well-established disobedience-and-contempt route here. It would have then had something at stake: a party willing to pay the price of being punished for its contempt is entitled to immediate appellate review. *See United States v. Ryan*, 402 U.S. 530, 533 (1971) ("[O]ne who seeks to resist the production of desired information . . . [must choose] between compliance with a trial court's order to produce prior to any review of that order, and resistance to that order with the concomitant possibility of an adjudication of contempt if his claims are rejected on appeal."). And in addition to potentially vindicating its interests through a contempt appeal or a mandamus petition, the government could have tried to mitigate the alleged harm caused by any erroneous disclosure of information by seeking a protective order. *See Mohawk Indus.*, 558 U.S. at 112 ("[P]rotective orders are available to limit the spillover effects of disclosing sensitive information.").

2. The government did not petition for a writ of mandamus, 28 U.S.C. § 1651(a), nor has it asked this Court to construe its notice of appeal as such, *Miller v. Gammie*, 335 F.3d 889, 895 (9th Cir. 2003) (en banc). *See* GOB 3, 19–20 n.4. For that reason alone, mandamus relief is not warranted here. *See Kerr v. U.S. Dist. Ct.*, 426 U.S. 394, 403 (1976) (explaining that a mandamus petitioner must "satisfy the burden of showing that [his] right to issuance of the writ is clear and indisputable") (internal quotation marks omitted). And it is too late for the government to assert otherwise. *See Perez-Silvan*, 861 F.3d at 938 (explaining that "arguments not raised by a party in its opening brief are deemed waived").

At any rate, the "extraordinary remedy" of mandamus is not justified under the circumstances of this case. *See Bauman v. U.S. Dist. Ct.*, 557 F.2d 650, 654 (9th Cir. 1977). Among other reasons, and as explained in more detail below, *see infra* at pp. 39–65, the district court's discretionary discovery ruling was not an abuse of discretion— let alone "clearly erroneous as a matter of law." *See Burlington N. & Santa Fe Ry. Co. v. U.S. Dist. Ct.*, 408 F.3d 1142, 1146 (9th Cir. 2005) (denying mandamus petition seeking to overturn a discovery ruling and

38

explaining that "absence of the third [*Bauman*] factor, clear error, is dispositive"). The government has not even attempted to show such error in this case, nor could it. *See Cooper v. Harris*, 581 U.S. 285, 309 (2017) ("Under [the clear error] standard of review, we affirm the court's finding so long as it is 'plausible.'").

## II. The District Court Appropriately Exercised Its Discretion in Ordering Discovery.

If this Court has appellate jurisdiction (*see supra* at pp. 22–39), it should conclude that the district court properly exercised its discretion in ordering discovery. First, contrary to the government's assertion, the court identified the correct legal standard for discovery on a selective prosecution claim. Second, because Wilson (joined by Beasley) proffered "some evidence" tending to show discriminatory effect and intent, the court was well within its discretion to permit discovery in aid of his claim. As a result, this Court should affirm.

### A. The district court identified the correct legal standard for selective prosecution discovery.

1. The equal protection component of the Fifth Amendment imposes certain constraints on the federal government's prosecutorial discretion. *Wayte v. United States*, 470 U.S. 598, 608 & n.9 (1985). Although this discretion is broad, the decision to prosecute cannot be

"deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification, . . . including the exercise of protected statutory and constitutional rights." *Id.* at 608 (internal quotation marks omitted); *cf. Berger v. United States*, 295 U.S. 78, 88 (1935) (explaining that the federal government's "obligation to govern impartially is as compelling as its obligation to govern at all").

The Supreme Court's decision in *Armstrong* sets forth the standard for selective prosecution discovery. 517 U.S. at 468. To obtain such discovery, the defendant must come forward with "'*some evidence tending to show the existence* of the essential elements of the defense,' discriminatory effect and discriminatory intent." *Id.* (emphasis added); *see also id.* (listing phrases used to describe the same concept, such as a "colorable basis," "substantial threshold showing," "substantial and concrete basis," and "reasonable likelihood").

Selective prosecution requirements are drawn from "ordinary equal protection standards." *Armstrong*, 517 U.S. at 465; *see also Wayte*, 470 U.S. at 608–09 (stating that "[i]t is appropriate to judge selective prosecution claims according to ordinary equal protection standards," and citing *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256 (1979), *Vill. of*

*Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252 (1977), and *Washington v. Davis*, 426 U.S. 229 (1976)). For example, to establish "some evidence tending to show the existence" of discriminatory effect, the Court has held that a defendant must "produce some evidence that similarly situated defendants . . . could have been prosecuted, but were not," a requirement that is "consistent with . . . equal protection case law." *Armstrong*, 517 U.S. at 469.

Because the standard for proving a selective prosecution claim is "demanding," the standard for getting discovery on such a claim is "correspondingly rigorous." *Armstrong*, 517 U.S. at 463, 468. Discovery "imposes many of the costs present when the Government must respond to a prima facie case of selective prosecution," like a diversion of resources and potential disclosure of prosecutorial strategy, so "the showing necessary to obtain discovery should itself be a significant barrier to the litigation of insubstantial claims." *Id.* at 464, 468.

Still, as this Court and others have recognized, "[t]he showing necessary to obtain discovery is *somewhat less*" than the showing necessary to establish an equal protection violation. *United States v. Arenas-Ortiz*, 339 F.3d 1066, 1069 (9th Cir. 2003) (emphasis added);

41

*see also United States v. Jones*, 159 F.3d 969, 978 (6th Cir. 1998)

("Obviously, a defendant need not prove his case in order to justify

discovery on an issue."). A selective prosecution claim, after all, should

not be "impossible to prove." *See Armstrong*, 517 U.S. at 466.

2.  The government suggests that the district court identified the

wrong the legal standard for selective prosecution discovery and thus

abused its discretion as a matter of law. GOB 21; *see also id.* at 26

(government suggesting that the court "misunderstood" the relevant

standard). Not at all. *See Hinkson*, 585 F.3d at 1264.

The district court correctly articulated the governing legal test. 1-

ER-15–16. And it accurately characterized the showing necessary for a

defendant to secure discovery in aid of a selective prosecution claim. 1-

ER-16 (district court explaining that, "[t]o obtain discovery on a

selective prosecution claim, the defendant must present 'some evidence

tending to show the existence of the essential elements of the defense,

discriminatory effect and discriminatory intent,'" and citing *Armstrong*,

517 U.S. at 468).

Indeed, a simple comparison of the government's opening brief

and the ruling at issue dispels any notion that the district court might

have "misunderstood" (GOB 26) the relevant standard. The court understood that prosecutors possess broad discretion in their charging decisions and that government officials are generally entitled to a presumption of regularity. *Compare* GOB 22, *with* 1-ER-15–16. It understood that, to prove a selective prosecution claim, the defense must demonstrate with clear evidence both discriminatory effect and discriminatory intent, and that this is a demanding standard. *Compare* GOB 23–24, *with* 1-ER-16. And it also understood that, to obtain selective prosecution discovery, the defense must proffer some evidence tending to show discriminatory effect and discriminatory intent, and that this standard is correspondingly rigorous. *Compare* GOB 24–25, *with* 1-ER-16. On this record, there is no basis to conclude that the court abused its discretion by misidentifying the applicable legal standard.

3. The government also faults the district court for stating that "a sufficient amount of evidence on one prong can satisfy the other," and for citing "civil suits against municipalities and private employers." GOB 24 n.5. This was not legal error, either.

Contrary to the government's suggestion, the district court did not somehow "conflate[]" (GOB 24 n.5) the discriminatory effect and intent prongs of a selective prosecution claim. The court merely said that, in certain circumstances, statistical evidence can bear on both facets of the analysis. 1-ER-25–26 (district court noting that Wilson's proffer as to discriminatory effect also "*supports*" his showing as to discriminatory intent) (emphasis added). Indeed, appellate courts have recognized that it is proper to infer "some evidence" of discriminatory intent from statistical evidence of discriminatory effect in a selective prosecution case. *E.g.*, *United States v. Thorpe*, 471 F.3d 652, 661 (6th Cir. 2006) ("[T]he government exaggerates by implying that statistical evidence of discriminatory effect . . . can never raise an inference of discriminatory intent."); *United States v. Alameh*, 341 F.3d 167, 173 (2d Cir. 2003) ("[Discriminatory] purpose may . . . be demonstrated through . . . statistical evidence.").

The Supreme Court's decision in *Yick Wo v. Hopkins*, 118 U.S. 356 (1886), is illustrative. In that case, the Court invalidated a San Francisco ordinance that prohibited the operation of laundries in wooden buildings. *Id.* at 366. The ordinance authorized the City's Board

of Supervisors to grant or deny laundry licenses in its discretion. *Id.*
But the Board denied 200 applications from individuals who were of
Chinese descent, and granted 80 applications from individuals who
were not. *Id.* at 374. Based on this statistical disparity, the Court
concluded that the ordinance was "applied by the public authorities
. . . with a mind so unequal and oppressive as to amount to a practical
denial by the state of . . . equal protection." *Id.* at 373; *see also*
*Gomillion v. Lightfoot*, 364 U.S. 339, 340–41 (1960) (recognizing an
equal protection violation in the exclusion of all but four or five of 400
possible Black voters in the City of Tuskegee, but not a single eligible
white voter).

This accords with both logic and common sense. As the Supreme
Court has acknowledged in the analogous employment discrimination
context, statistical evidence of an imbalance on the basis of race or other
protected class "is often a telltale sign of purposeful discrimination." *See*
*Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 340 n.20 (1977).
That is because, "absent explanation, it is ordinarily to be expected that
nondiscriminatory hiring practices will in time result in a work force
more or less representative of the racial and ethnic composition of the

population in the community from which employees are hired." *Id.*
Likewise, in the selective prosecution context, nondiscriminatory
prosecutorial practices would generally be expected to have
nondiscriminatory effects on the relevant population. *See id.* at 335 n.15
(explaining that "[p]roof of discriminatory motive . . . can in some
situations be inferred from the mere fact of differences in treatment");
*Arlington Heights*, 429 U.S. at 266 (noting that a "clear pattern [of
disparate impact], unexplainable on grounds other than race," could be
evidence of purposeful discrimination).

To the extent that the government believes (GOB 24 n.5) the
district court legally erred in even considering civil equal protection
cases, as opposed to exclusively criminal selective prosecution cases, it
is wrong. *E.g.*, *Armstrong*, 517 U.S. at 466–67 (consulting "ordinary
equal protection principles," and citing *Yick Wo* among other cases);
*Wayte*, 470 U.S. at 608–09 (drawing on "ordinary equal protection
standards," and citing *Arlington Heights* among other cases).[6]

---

[6] This Court has applied equal protection doctrine in other
areas concerning, as the government puts it, "the Executive Branch's
sovereign authority" (GOB 24 n.5). *See Regents of the Univ. of Cal.
v. Dep't of Homeland Sec.*, 908 F.3d 476, 518–20 (9th Cir. 2018)

In any event, the government's criticism is largely academic here. The district court went on to consider other evidence—separate and apart from any statistics bearing on discriminatory effect—when it assessed Wilson's showing on the discriminatory intent prong of his selective prosecution claim. 1-ER-27–29 (considering, among other things, policies and contemporaneous public statements of President Trump and Attorney General Barr).

**B.    The district court acted well within its discretion because there was "some evidence" to support selective prosecution discovery in this case.**

The district court identified the applicable legal standard, considered all evidence and arguments presented by the parties, cautiously declined to dismiss the indictment on selective prosecution grounds, and instead ordered discovery subject to any assertions of the deliberative process privilege. 1-ER-12–31. For this, the government accuses the court of going "badly off the rails." GOB 2. But it has failed

---

(applying *Arlington Heights* in an equal protection case challenging the Trump Administration's rescission of the Deferred Action for Childhood Arrivals program). The Supreme Court did the same in reviewing *Regents*, though it ultimately reversed on other grounds. *See* 140 S. Ct. 1891, 1915–16 (2020) (assuming without deciding that *Arlington Heights* applies); *id.* at 1917–18 (Sotomayor, J., concurring in part, concurring in the judgment in part, and dissenting in part).

to establish a basis for reversal of the court's discretionary discovery ruling, to which of course deference is due. *See Mohawk Indus.*, 558 U.S. at 110 (explaining that discovery rulings "are unlikely to be reversed on appeal, particularly when they rest on factual determinations for which appellate deference is the norm"); *Reise v. Bd. of Regents*, 957 F.2d 293, 295 (7th Cir. 1992) (noting that "almost all interlocutory appeals from discovery orders would end in affirmance" because "the district court possesses discretion, and review is deferential").[7]

### 1. *The district court properly found that there was some evidence tending to show discriminatory effect.*

a.  As explained above, to obtain selective prosecution discovery, a defendant must come forward with "some evidence" tending to show the existence of discriminatory effect. *Armstrong*, 517 U.S. at 468. This means "produc[ing] some evidence of differential treatment of similarly

---

[7] To the extent this Court believes that additional factual findings are needed to support selective prosecution discovery, Wilson and Beasley respectfully request that the case be remanded for further proceedings before the district court in the first instance. *See* 28 U.S.C. § 2106 (providing that appellate courts may remand and require such further proceedings "as may be just under the circumstances").

48

situated members of other races or protected classes." *Id.* at 470. For example, in a case involving allegations of racial discrimination, the defendant may present some evidence that "similarly situated persons of other races were prosecuted by the State . . . and were known to federal law enforcement officers, but were not prosecuted in federal court." *Id.*; *see also Sellers*, 906 F.3d at 853 ("[C]omparing who was arrested with who was prosecuted, or the demographics of those prosecuted in state and federal courts for the same crime, may evince differential treatment of similarly situated individuals.").

That is what the district court did here. 1-ER-17–24. Based on Wilson's statistical evidence, the court found that the government was "no doubt aware of many of the arsons—some of which were very serious—that occurred in the Central District during the last 15 or so years." 1-ER-23. For example, it referenced a federal law enforcement report, which "identified 329 arsons in 2019 in the Central District," as well as case-specific examples of "far more serious and damaging arsons" in the community that the government was "obviously aware of and chose not to federally prosecute." 1-ER-23; *see also* 2-ER-158, 254–57. In response, the government failed to dispute "that many of the

49

arsons involving buildings . . . , businesses, and vehicles could have been federally prosecuted" under 18 U.S.C. §§ 844(f) or (i). 1-ER-23–24. And it also failed to dispute that "no other stand-alone federal arson case—*other than those that involved conduct during the George Floyd protests*—has been brought in the Central District in nearly 15 years." 1-ER-24 (emphasis added). On this record, the court's conclusion was not "illogical, implausible, or without support in inferences that may be drawn from the record." *See Hinkson*, 585 F.3d at 1262.

b. The government does not appear to contest the accuracy of this data on appeal; it instead argues that the district court selected an "overinclusive" comparison group. GOB 26–30. The point of identifying a similarly situated group is to "isolate the factor allegedly subject to impermissible discrimination." *United States v. Aguilar*, 883 F.2d 662, 706 (9th Cir. 1989), *superseded by statute on other grounds*, Immigration Reform and Control Act of 1986, Pub. L. No. 99-603, 100 Stat. 3359, *as recognized in United States v. Gonzalez-Torres*, 309 F.3d 594 (9th Cir. 2002). So if the comparison group and the defendant are "the same in all relevant respects, except that defendant was, for instance, *exercising his first amendment rights*," then "the prosecution

of only those persons exercising their constitutional rights gives rise to an inference of discrimination." *Id.* (emphasis added).

But this does not mean, as the government claims, there must be "*no* distinguishable legitimate prosecutorial factors that might justify making different prosecutorial decisions." GOB 28–29 (quoting *United States v. Hastings*, 126 F.3d 310, 315 (4th Cir. 1996)). While things like strength of the evidence, criminal history, and alleged risk of violence may inform a prosecutor's charging decisions (GAB 29), this Court has not held that such characteristics are necessary to make a group similarly situated for selective prosecution purposes. *See Aguilar*, 883 F.2d at 706–07 (explaining that, in tax protest cases, "*all those who refuse to pay taxes* are generally treated as being similarly situated") (emphasis added). Indeed, under such a hyper-specific and granular approach, almost no case would be similarly situated to another. *See* GOB 28 (government implying a need to identify arsons involving "police vehicles, violently smashed property, a crowd of onlookers, filmed recordings posted online, or defendants with substantial criminal records"). Simply put, Wilson and Beasley did not have to establish that

each arson in the comparison group was all-but-identical to their own alleged conduct.

The government overreads *United States v. Steele*, 461 F.2d 1148 (9th Cir. 1972). GOB 38–40. In that case, four residents of Hawaii were federally prosecuted for refusing to answer the 1970 census questionnaire. *Steele*, 461 F.2d at 1150. They had also "participated in a census resistance movement," espousing "a dissident view of the census as an unconstitutional invasion of privacy" and encouraging people "to avoid compliance with census requirements." *Id.* at 1150–51. In support of a selective prosecution claim, one defendant located six others who committed the same offense but had not "taken a public stand against the census" and were not prosecuted. *Id.* at 1151. He further showed that the government either knew or should have known about these other individuals. *Id.* at 1152 (explaining that normal "census operating procedures" would provide information about anyone who failed to complete the questionnaire).

This Court reversed the conviction. *Steele*, 461 F.2d at 1152. It found a "strong inference of discriminatory prosecution" by comparing the defendant's case with the six other individuals who had committed

52

the same offense—i.e., failing to answer the questionnaire—but were not associated with a census resistance movement. *Id.* The Court did not also inquire, as the government would like, into whether the defendant had shown there were "no other characteristics" that distinguished him from the comparison group. *Compare* GOB 39–40, *with Aguilar*, 883 F.2d at 707 (explaining that "*all persons refusing to complete census forms are considered similarly situated*, so that prosecution only of persons expressing vocal opposition to the census gives rise to a claim of selective prosecution") (emphasis added). Wilson has made a similar comparison here. 1-ER-22.[8]

The government also takes *Turner* out of context. That case does not stand for the general proposition that defendants must establish an

---

[8] The government says this Court has invariably rejected selective prosecution claims—aside from *Steele*—and otherwise blocked discovery in aid of such claims. GOB 38 n.9 (citing cases). That winning selective prosecution claims may be "rare" (GOB 40) in no way means they are "impossible to prove." *See Armstrong*, 517 U.S. at 466. Courts have in fact granted selective prosecution discovery post-*Armstrong* and the sky has not fallen. *E.g.*, *Jones*, 159 F.3d at 978 (finding that defendant "set forth 'some evidence' tending to show the existence of discriminatory effect that warrants discovery on his selective prosecution claim"). In all events, as explained herein, Wilson has made the rigorous showing needed to overcome the "separation-of powers concerns" (GOB 24) cited by the government.

exceedingly "close fit" between themselves and the control group. GOB 27. *Turner* involved a claim of race-based selective prosecution, where this Court held that the defendants failed to make the requisite "threshold showing" of discriminatory effect and were therefore not entitled to discovery. 104 F.3d at 1184. The defendants had relied in part on the same statistical evidence rejected by the Supreme Court in *Armstrong*, albeit somewhat "enlarg[ed]" and augmented with "anecdotes and hearsay." *Id.* at 1184–85. Notably, and unlike this case, federal prosecutors and law enforcement officers had provided affidavits establishing that racial bias played no role in their decisions. *Id.* at 1182–83, 1185. The government had thus established through sworn testimony that it had a "neutral, nonracial" basis for the prosecutions, i.e., a focus on "the investigation of violent street gangs," and the defendants' outmoded statistical evidence was silent as to this "principal characteristic." *Id.* at 1185. *Turner* is far afield.

In any event, as the district court recognized, the government's proposed control group here was itself highly problematic. 1-ER-20–21. Rather than comparing this case with all arsons in the Central District of California that could have been federally prosecuted but were not,

the government suggested a vastly underinclusive group: "[T]he three other arson cases charged in this District for conduct that occurred during the George Floyd protests." 1-ER-20. As the district court rightly recognized, that small group of cases could not possibly serve as the proper control group because they "share the same characteristic of being targeted for imputed anti-government views." 1-ER-21. The government's alternative control group would not have "isolate[d] the factor allegedly subject to impermissible discrimination," i.e., that the accused were perceived to hold anti-government views and that the alleged offense was associated with the George Floyd protests. 1-ER-22.

c. The government also argues that the district court improperly referenced "raw statistics" about the total number of arsons. GOB 32–33. It primarily relies on *United States v. Bass*, 536 U.S. 862 (2002) (per curiam), a case in which the Supreme Court summarily concluded that a defendant had not met his burden to obtain discovery in support of his selective prosecution claim.

*Bass* is not remotely on point. The defendant in that case, a Black man, had been indicted for "the intentional firearm killings of two individuals," and the government "filed a notice of intent to seek the

death penalty." *Bass*, 536 U.S. at 862. The defendant moved to dismiss the death penalty notice or alternatively to compel discovery in support of a selective prosecution claim, arguing that the government had decided to seek the death penalty again him based on his race. *Id.* at 862–63. In support this claim, however, the defendant offered only "nationwide statistics" showing that the government "charges blacks with a death-eligible offense more than twice as often as it charges whites," and that it "enters into plea bargains more frequently with whites than it does with blacks." *Id.* at 863.

The Supreme Court rejected this showing, summarily concluding that "raw statistics regarding overall charges say nothing about charges brought against *similarly situated defendants*." *Bass*, 536 U.S. at 864 (emphasis in original). As an initial matter, it is hardly clear that *Bass* applies here due to the unique factual circumstances of that case: the defendant there had actually been "offered a plea bargain but declined it," which directly undermined his own theory of racial discrimination. *Id.* Moreover, the defendant there improperly relied on "nationwide"— as opposed to local—statistics. *Id.* at 863. The evidentiary showing that failed in *Bass* is therefore distinguishable from the data that Wilson has

presented in this case. 2-ER-146–52, 156–59. Here, the district court properly relied on data that identified and quantified a similarly situated population, located it specifically within the Central District of California, and showed that the government had failed to prosecute similarly situated individuals. 1-ER-17–20, 23–24. *Bass* does not require anything more.

> ### 2. The district court properly found that there was some evidence tending to show discriminatory intent.

a.  To obtain discovery on a selective prosecution claim, the defendant must also produce "some evidence" tending to show the existence of discriminatory intent. *Armstrong*, 517 U.S. at 468. Discriminatory intent "implies that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Wayte*, 470 U.S. at 610 (quoting *Feeney*, 442 U.S. at 279); *see also Arlington Heights*, 429 U.S. at 265–66 (asking whether "discriminatory purpose has been *a motivating factor* in the decision") (emphasis added).

This entails "a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Arlington Heights*, 429

U.S. at 266. Relevant factors include: (1) "[t]he impact of the official action," whether it "bears more heavily on one race [or protected class] than another"; (2) "[t]he historical background of the decision"; (3) "[t]he specific sequence of events leading up to the challenged decision"; (4) "[d]epartures from the normal procedural sequence," as well as certain "[s]ubstantive departures"; and (5) "[t]he legislative or administrative history," including "contemporary statements by members of the decisionmaking body, minutes of its meetings, or reports." *Id.* at 266–68. This list of factors is "non-exhaustive," and a challenger "need not establish any particular element" to show discriminatory intent. *Ave. 6E Invs., LLC v. City of Yuma*, 818 F.3d 493, 504 (9th Cir. 2016).

After conducting this sensitive inquiry, the district court found some evidence that discriminatory purpose was a motivating factor in the government's decision to prosecute here. 1-ER-24–30. For example, the court found some evidence that the Department of Justice "adopted a policy" of targeting those who appeared to hold anti-government views and were associated with the George Floyd protests. 1-ER-27–28. It cited Attorney General Barr's task force memorandum to all U.S.

Attorneys, in which he claimed that "anti-government extremists" are interspersed "[a]mid peaceful demonstrations protected by the First Amendment," and that he was creating "a task force devoted to countering violent anti-government extremists" to "help law enforcement at all levels identify, investigate, and prosecute" such individuals. 1-ER-27–28. The court also referenced Attorney General Barr's conference call with U.S. Attorneys across the country, during which he directed the top federal prosecutors to "seek . . . federal charges" against demonstrators, "even when state charges could apply." 1-ER-28.

Likewise, the district court determined that public statements made by President Trump and Attorney General Barr provided some evidence of "the government actors' retaliatory thinking in seeking to use the legal system to charge individuals such as Wilson." 1-ER-29. For instance, the court recounted a conference call with state governors, in which President Trump specifically referenced "what went on in Los Angeles" and called for "[t]otal domination." 1-ER-28. He directed his ire at "Antifa" and the "radical left," insisted that law enforcement must "arrest these people" and "judge them," and demanded harsher

punishment (as opposed to a imagined "deal" where they only got one week in jail). *Id.* And in a remarkable moment, the President seemed to even admit that his intent was "to do retribution" using the legal system. 1-ER-28–29. During this same call, Attorney General Barr also attributed civil unrest to "extremist anarchist agitators," and discouraged "treat[ing] these as demonstrations" because it would hamper "the dynamic ability to go out and arrest the troublemakers." 1-ER-29.

In short, the "historical background" of the decision, the "specific sequence of events" leading up to the decision, and the "contemporary statements" of the decisionmakers all provide some evidence that the government specifically targeted for federal prosecution those individuals it believed to hold anti-government views and who were associated with the George Floyd protests. *See Arlington Heights*, 429 U.S. at 266–68. The court's determination, based on the evidence before it, was not "illogical, implausible, or without support in inferences that may be drawn from the record." *See Hinkson*, 585 F.3d at 1262.[9]

---

[9] In an analogous context, courts have found evidence of improper animus based on far less overt statements by relevant actors. *E.g.*,

b.  The government does not appear to dispute the substance of these public statements on appeal; rather, it argues that Wilson and Beasley simply were not engaged in any protected conduct. GOB 36–38; *id.* at 33 (government arguing that "being a *violent* anti-government extremist" is not a protected classification). That is not an accurate characterization of the claim.

As the district court recognized, there was some evidence tending to show that the government decided to prosecute Wilson and Beasley at least in part because "the alleged offense was associated with expressive conduct and [it] believed [they] held and espoused anti-government views." 1-ER-25. Whatever the Supreme Court meant by "other arbitrary classification," *Oyler v. Boles*, 368 U.S. 448, 456 (1962), the group of protesters targeted here by the government surely falls within it. *See Wayte*, 470 U.S. at 608 (explaining that government

_____

*Wash. v. Seattle Sch. Dist. No. 1*, 458 U.S. 457, 471 (1982) (finding that the "racial nature" of an anti-busing initiative was not difficult to perceive, despite its facial neutrality, where proponents also sought to halt desegregation); *Ave. 6E Invs.*, 818 F.3d at 506 (finding that statements about "large households" and use of "single-family homes as multi-family dwellings" plausibly contained "code words consisting of stereotypes of Hispanics"); *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1117 (9th Cir. 2004) ("The reference to [plaintiff] as a 'drug dealer' might certainly be deemed to be a code word or phrase.").

action violates equal protection where it is "deliberately based upon an unjustifiable standard," including "the exercise of protected statutory and constitutional rights"); *United States v. Oakes*, 11 F.3d 897, 898–99 (9th Cir. 1993) (explaining that "proof of discrimination based on . . . personal beliefs" would be enough to trigger a court's constitutional scrutiny of prosecutorial charging discretion).

Contrary to the government's assertion, there is no requirement that expressive activity must be entirely "separate" from the alleged offense. GOB 40–41. This Court's decision in *Steele* confirms that the government is prohibited from prosecuting and punishing individuals more harshly for being affiliated with a "dissident" political group. *See Steele*, 461 F.2d at 1150. As recounted above, in that case, four people in Hawaii were federally prosecuted for refusing to answer the census questionnaire at least in part because they had "participated in a census resistance movement," which promoted "a dissident view of the census." *Id.* at 1150–51. In reversing the defendant's conviction for selective prosecution, this Court explained that "[a]n enforcement procedure that focuses upon the vocal offender is inherently suspect, since it is vulnerable to the charge that those chosen for prosecution are

being punished for their expression of ideas, a constitutionally protected right." *Id.* at 1152.

The relevant question is not whether the offense conduct and the constitutionally protected expressive conduct are totally distinct; but instead, whether similarly situated people who were not engaged in protected conduct are committing the same crime and not being prosecuted to the same extent. *See Aguilar*, 883 F.2d at 706 (suggesting that the prosecution of only those persons "exercising [their] first amendment rights" could give rise to an inference of discrimination); *United States v. Falk*, 479 F.2d 616, 620 (7th Cir. 1973) (en banc) (remanding for hearing on selective prosecution for allegedly targeting defendant as a member of Chicago Area Draft Resisters).

Moreover, as the district court found, the public statements by President Trump and Attorney General Barr, the Attorney General's task force memorandum, and the conference that the Attorney General held with U.S. Attorneys across the country all suggest that the government itself may have viewed politically unpopular individuals associated with the George Floyd protests as "anti-government extremists." 1-ER-26. Indeed, as explained above, President Trump and

Attorney General Barr made contemporaneous public statements in which they conflated racial injustice protesters, "Antifa," the "far left," and "communis[ts]," and grouped such people together under the rubric of those who held "anti-government" views. 1-ER-12–15.

c. The government also suggests that, in actuality, "[n]either defendant had clearly discernable political views." GOB 33 n.7. It appears to imply that Wilson and Beasley could not have been unconstitutionally targeted for federal prosecution based on a political ideology that they did not actually subscribe to.

As an initial matter, whether Wilson and Beasley actually held "anti-government" beliefs is not determinative here. 1-ER-26–27. Under their theory of selective prosecution, it is the government that discerned and imputed the arbitrary classification. 1-ER-27 (district court explaining that Attorney General Barr's task force memorandum acknowledged that "extremists profess a variety of ideologies," but "are united in their opposition to the core constitutional values of a democratic society governed by law"). Moreover, lack of knowledge of someone's precise classification would not necessarily preclude a finding of discrimination, since discrimination can be premised on actual or

perceived classification. *Cf. Est. of Amos ex rel. Amos v. City of Page*, 257 F.3d 1086, 1094 (9th Cir. 2001) ("That [plaintiff] was actually white [instead of a Native American] does not make th[e] discrimination or its resulting injury less direct. . . . The City's alleged discrimination is no less malevolent because it was based upon an erroneous assumption.").

In any event, as the district court found, some of the government's own exhibits include information suggesting that it may have viewed Wilson and Beasley as professing "anti-government" views. 1-ER-27; *see also* 2-ER-86, 111 (documents suggesting, e.g., that Beasley "escalat[ed] protest groups in Oakland" and "travel[ed] throughout California to participate in protests and potentially escalate protesters").

## CONCLUSION

For the foregoing reasons, the government's appeal should be dismissed for lack of jurisdiction. Alternatively, if this Court concludes that it has appellate jurisdiction, the district court's discovery ruling should be affirmed.

Dated: November 20, 2023   Respectfully submitted,

            CUAUHTEMOC ORTEGA
            FEDERAL PUBLIC DEFENDER

            By: /s/ *Andrew B. Talai*
              Andrew B. Talai
              Deputy Federal Public Defender

              *Counsel for Defendant-Appellee*
              *Nathan Wilson*

            BUEHLER & KASSABIAN, LLP

            By: /s/ *Mark M. Kassabian*
              Mark M. Kassabian

              *Counsel for Defendant-Appellee*
              *Christopher Beasley*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 17. Statement of Related Cases Pursuant to Circuit Rule 28-2.6

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form17instructions.pdf

**9th Cir. Case Number(s)** | 23-50016

The undersigned attorney or self-represented party states the following:

◉ I am unaware of any related cases currently pending in this court.

○ I am unaware of any related cases currently pending in this court other than the case(s) identified in the initial brief(s) filed by the other party or parties.

○ I am aware of one or more related cases currently pending in this court. The case number and name of each related case and its relationship to this case are:

**Signature** | /s/ Andrew Talai | **Date** | Nov 20, 2023

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 17** *New 12/01/2018*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT
### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* *http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** | 23-50016

I am the attorney or self-represented party.

**This brief contains** | 12,732 | **words**, excluding the items exempted

by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R.

App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

(•) complies with the word limit of Cir. R. 32-1.

( ) is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

( ) is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

( ) is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

( ) complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one):*

    ( ) it is a joint brief submitted by separately represented parties;

    ( ) a party or parties are filing a single brief in response to multiple briefs; or

    ( ) a party or parties are filing a single brief in response to a longer joint brief.

( ) complies with the length limit designated by court order dated [        ].

( ) is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | /s/ Andrew B. Talai | **Date** | Nov 20, 2023
*(use "*s/[typed name]*" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* *forms@ca9.uscourts.gov*

**Form 8**                                                       *Rev. 12/01/2018*

**ADDENDUM**

CONSTITUTIONAL AND STATUTORY
PROVISIONS INVOLVED

## TABLE OF CONTENTS

**Page**

**Constitutional Provisions**

U.S. Const. amend. I.................................................................1a

U.S. Const. amend. V................................................................2a

U.S. Const. amend. VI ..............................................................3a

**Statutes**

18 U.S.C. § 844 .........................................................................4a

18 U.S.C. § 3731........................................................................8a

28 U.S.C. § 1291........................................................................9a

28 U.S.C. § 1292......................................................................10a

28 U.S.C. § 1651......................................................................13a

United States Code Annotated
    Constitution of the United States
        Annotated
            Amendment I. Religion; Speech and the Press; Assembly; Petition

U.S.C.A. Const. Amend. I

Amendment I. Establishment of Religion; Free Exercise of Religion; Freedom
of Speech and the Press; Peaceful Assembly; Petition for Redress of Grievances

Currentness

Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

&lt;Historical notes and references are included in the full text document for this amendment.&gt;

&lt;For Notes of Decisions, see separate documents for clauses of this amendment:&gt;

&lt;USCA Const Amend. I--Establishment clause; Free Exercise clause&gt;

&lt;USCA Const Amend. I--Free Speech clause; Free Press clause&gt;

&lt;USCA Const Amend. I--Assembly clause; Petition clause&gt;

U.S.C.A. Const. Amend. I, USCA CONST Amend. I
Current through P.L. 118-21. Some statute sections may be more current, see credits for details.

**End of Document**          © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Add. 1a

United States Code Annotated
    Constitution of the United States
        Annotated
            Amendment V. Grand Jury; Double Jeopardy; Self-Incrimination; Due Process; Takings

U.S.C.A. Const. Amend. V

Amendment V. Grand Jury Indictment for Capital Crimes; Double Jeopardy;
Self-Incrimination; Due Process of Law; Takings without Just Compensation

Currentness

No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury, except in cases arising in the land or naval forces, or in the Militia, when in actual service in time of War or public danger; nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb; nor shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation.

<Historical notes and references are included in the full text document for this amendment.>

<For Notes of Decisions, see separate documents for clauses of this amendment:>

<USCA Const. Amend. V--Grand Jury clause>

<USCA Const. Amend. V--Double Jeopardy clause>

<USCA Const. Amend. V--Self-Incrimination clause>

<USCA Const. Amend. V-- Due Process clause>

<USCA Const. Amend. V--Takings clause>

U.S.C.A. Const. Amend. V, USCA CONST Amend. V
Current through P.L. 118-19. Some statute sections may be more current, see credits for details.

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

Add. 2a

United States Code Annotated
   Constitution of the United States
      Annotated
         Amendment VI. Jury Trial for Crimes, and Procedural Rights (Refs & Annos)

U.S.C.A. Const. Amend. VI-Jury Trials

Amendment VI. Jury trials for crimes, and procedural rights [Text & Notes of Decisions subdivisions I to XXII]

Currentness

<Notes of Decisions for this amendment are displayed in multiple documents.>

In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defence.

U.S.C.A. Const. Amend. VI-Jury Trials, USCA CONST Amend. VI-Jury Trials
Current through P.L. 118-19. Some statute sections may be more current, see credits for details.

End of Document                                  © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Add. 3a

United States Code Annotated
   Title 18. Crimes and Criminal Procedure (Refs & Annos)
      Part I. Crimes (Refs & Annos)
         Chapter 40. Importation, Manufacture, Distribution and Storage of Explosive Materials

18 U.S.C.A. § 844

§ 844. Penalties

Effective: November 30, 2004
Currentness

**(a)** Any person who--

  **(1)** violates any of subsections (a) through (i) or (l) through (o) of section 842 shall be fined under this title, imprisoned for not more than 10 years, or both; and

  **(2)** violates subsection (p)(2) of section 842, shall be fined under this title, imprisoned not more than 20 years, or both.

**(b)** Any person who violates any other provision of section 842 of this chapter shall be fined under this title or imprisoned not more than one year, or both.

**(c)(1)** Any explosive materials involved or used or intended to be used in any violation of the provisions of this chapter or any other rule or regulation promulgated thereunder or any violation of any criminal law of the United States shall be subject to seizure and forfeiture, and all provisions of the Internal Revenue Code of 1986 relating to the seizure, forfeiture, and disposition of firearms, as defined in section 5845(a) of that Code, shall, so far as applicable, extend to seizures and forfeitures under the provisions of this chapter.

**(2)** Notwithstanding paragraph (1), in the case of the seizure of any explosive materials for any offense for which the materials would be subject to forfeiture in which it would be impracticable or unsafe to remove the materials to a place of storage or would be unsafe to store them, the seizing officer may destroy the explosive materials forthwith. Any destruction under this paragraph shall be in the presence of at least 1 credible witness. The seizing officer shall make a report of the seizure and take samples as the Attorney General may by regulation prescribe.

**(3)** Within 60 days after any destruction made pursuant to paragraph (2), the owner of (including any person having an interest in) the property so destroyed may make application to the Attorney General for reimbursement of the value of the property. If the claimant establishes to the satisfaction of the Attorney General that--

  **(A)** the property has not been used or involved in a violation of law; or

  **(B)** any unlawful involvement or use of the property was without the claimant's knowledge, consent, or willful blindness,

Add. 4a

§ 844. Penalties, 18 USCA § 844

the Attorney General shall make an allowance to the claimant not exceeding the value of the property destroyed.

**(d)** Whoever transports or receives, or attempts to transport or receive, in interstate or foreign commerce any explosive with the knowledge or intent that it will be used to kill, injure, or intimidate any individual or unlawfully to damage or destroy any building, vehicle, or other real or personal property, shall be imprisoned for not more than ten years, or fined under this title, or both; and if personal injury results to any person, including any public safety officer performing duties as a direct or proximate result of conduct prohibited by this subsection, shall be imprisoned for not more than twenty years or fined under this title, or both; and if death results to any person, including any public safety officer performing duties as a direct or proximate result of conduct prohibited by this subsection, shall be subject to imprisonment for any term of years, or to the death penalty or to life imprisonment.

**(e)** Whoever, through the use of the mail, telephone, telegraph, or other instrument of interstate or foreign commerce, or in or affecting interstate or foreign commerce, willfully makes any threat, or maliciously conveys false information knowing the same to be false, concerning an attempt or alleged attempt being made, or to be made, to kill, injure, or intimidate any individual or unlawfully to damage or destroy any building, vehicle, or other real or personal property by means of fire or an explosive shall be imprisoned for not more than 10 years or fined under this title, or both.

**(f)(1)** Whoever maliciously damages or destroys, or attempts to damage or destroy, by means of fire or an explosive, any building, vehicle, or other personal or real property in whole or in part owned or possessed by, or leased to, the United States, or any department or agency thereof, or any institution or organization receiving Federal financial assistance, shall be imprisoned for not less than 5 years and not more than 20 years, fined under this title, or both.

**(2)** Whoever engages in conduct prohibited by this subsection, and as a result of such conduct, directly or proximately causes personal injury or creates a substantial risk of injury to any person, including any public safety officer performing duties, shall be imprisoned for not less than 7 years and not more than 40 years, fined under this title, or both.

**(3)** Whoever engages in conduct prohibited by this subsection, and as a result of such conduct directly or proximately causes the death of any person, including any public safety officer performing duties, shall be subject to the death penalty, or imprisoned for not less than 20 years or for life, fined under this title, or both.

**(g)(1)** Except as provided in paragraph (2), whoever possesses an explosive in an airport that is subject to the regulatory authority of the Federal Aviation Administration, or in any building in whole or in part owned, possessed, or used by, or leased to, the United States or any department or agency thereof, except with the written consent of the agency, department, or other person responsible for the management of such building or airport, shall be imprisoned for not more than five years, or fined under this title, or both.

**(2)** The provisions of this subsection shall not be applicable to--

**(A)** the possession of ammunition (as that term is defined in regulations issued pursuant to this chapter) in an airport that is subject to the regulatory authority of the Federal Aviation Administration if such ammunition is either in checked baggage or in a closed container; or

Add. 5a

**(B)** the possession of an explosive in an airport if the packaging and transportation of such explosive is exempt from, or subject to and in accordance with, regulations of the Pipeline and Hazardous Materials Safety Administration for the handling of hazardous materials pursuant to chapter 51 of title 49.

**(h)** Whoever--

**(1)** uses fire or an explosive to commit any felony which may be prosecuted in a court of the United States, or

**(2)** carries an explosive during the commission of any felony which may be prosecuted in a court of the United States,

including a felony which provides for an enhanced punishment if committed by the use of a deadly or dangerous weapon or device shall, in addition to the punishment provided for such felony, be sentenced to imprisonment for 10 years. In the case of a second or subsequent conviction under this subsection, such person shall be sentenced to imprisonment for 20 years. Notwithstanding any other provision of law, the court shall not place on probation or suspend the sentence of any person convicted of a violation of this subsection, nor shall the term of imprisonment imposed under this subsection run concurrently with any other term of imprisonment including that imposed for the felony in which the explosive was used or carried.

**(i)** Whoever maliciously damages or destroys, or attempts to damage or destroy, by means of fire or an explosive, any building, vehicle, or other real or personal property used in interstate or foreign commerce or in any activity affecting interstate or foreign commerce shall be imprisoned for not less than 5 years and not more than 20 years, fined under this title, or both; and if personal injury results to any person, including any public safety officer performing duties as a direct or proximate result of conduct prohibited by this subsection, shall be imprisoned for not less than 7 years and not more than 40 years, fined under this title, or both; and if death results to any person, including any public safety officer performing duties as a direct or proximate result of conduct prohibited by this subsection, shall also be subject to imprisonment for any term of years, or to the death penalty or to life imprisonment.

**(j)** For the purposes of subsections (d), (e), (f), (g), (h), and (i) of this section and section 842(p), the term "explosive" means gunpowders, powders used for blasting, all forms of high explosives, blasting materials, fuzes (other than electric circuit breakers), detonators, and other detonating agents, smokeless powders, other explosive or incendiary devices within the meaning of paragraph (5) of section 232 of this title, and any chemical compounds, mechanical mixture, or device that contains any oxidizing and combustible units, or other ingredients, in such proportions, quantities, or packing that ignition by fire, by friction, by concussion, by percussion, or by detonation of the compound, mixture, or device or any part thereof may cause an explosion.

**(k)** A person who steals any explosives materials which are moving as, or are a part of, or which have moved in, interstate or foreign commerce shall be imprisoned for not more than 10 years, fined under this title, or both.

**(l)** A person who steals any explosive material from a licensed importer, licensed manufacturer, or licensed dealer, or from any permittee shall be fined under this title, imprisoned not more than 10 years, or both.

**(m)** A person who conspires to commit an offense under subsection (h) shall be imprisoned for any term of years not exceeding 20, fined under this title, or both.

Add. 6a

**(n)** Except as otherwise provided in this section, a person who conspires to commit any offense defined in this chapter shall be subject to the same penalties (other than the penalty of death) as the penalties prescribed for the offense the commission of which was the object of the conspiracy.

**(o)** Whoever knowingly transfers any explosive materials, knowing or having reasonable cause to believe that such explosive materials will be used to commit a crime of violence (as defined in section 924(c)(3)) or drug trafficking crime (as defined in section 924(c)(2)) shall be subject to the same penalties as may be imposed under subsection (h) for a first conviction for the use or carrying of an explosive material.

**(p) Theft Reporting Requirement.--**

**(1) In general.--**A holder of a license or permit who knows that explosive materials have been stolen from that licensee or permittee, shall report the theft to the Secretary [1] not later than 24 hours after the discovery of the theft.

**(2) Penalty.--**A holder of a license or permit who does not report a theft in accordance with paragraph (1), shall be fined not more than $10,000, imprisoned not more than 5 years, or both.

### CREDIT(S)

(Added Pub.L. 91-452, Title XI, § 1102(a), Oct. 15, 1970, 84 Stat. 956; amended Pub.L. 97-298, § 2, Oct. 12, 1982, 96 Stat. 1319; Pub.L. 98-473, Title II, § 1014, Oct. 12, 1984, 98 Stat. 2142; Pub.L. 99-514, § 2, Oct. 22, 1986, 100 Stat. 2095; Pub.L. 100-690, Title VI, § 6474(a), (b), Nov. 18, 1988, 102 Stat. 4379; Pub.L. 101-647, Title XXXV, § 3522, Nov. 29, 1990, 104 Stat. 4924; Pub.L. 103-272, § 5(e)(7), July 5, 1994, 108 Stat. 1374; Pub.L. 103-322, Title VI, § 60003(a)(3), Title XI, §§ 110504(b), 110509, 110515(b), 110518(b), Title XXXII, §§ 320106, 320917(a), Title XXXIII, § 330016(1)(H), (K), (L), (N), Sept. 13, 1994, 108 Stat. 1969, 2016, 2018, 2020, 2111, 2129, 2147, 2148; Pub.L. 104-132, Title VI, § 604, Title VII, §§ 701, 706, 708(a), (c)(3), 724, Apr. 24, 1996, 110 Stat. 1289, 1291, 1295-1297, 1300; Pub.L. 104-294, Title VI, § 603(a), Oct. 11, 1996, 110 Stat. 3503; Pub.L. 106-54, § 2(b), Aug. 17, 1999, 113 Stat. 399; Pub.L. 107-296, Title XI, §§ 1112(e)(3), 1125, 1127, Nov. 25, 2002, 116 Stat. 2276, 2285; Pub.L. 108-426, § 2(c)(6), Nov. 30, 2004, 118 Stat. 2424.)

### Footnotes

1      So in original. Probably should be "Attorney General".

18 U.S.C.A. § 844, 18 USCA § 844
Current through P.L. 118-21. Some statute sections may be more current, see credits for details.

                © 2023 Thomson Reuters. No claim to original U.S. Government Works.

   © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Add. 7a

United States Code Annotated
    Title 18. Crimes and Criminal Procedure (Refs & Annos)
        Part II. Criminal Procedure
            Chapter 235. Appeal (Refs & Annos)

18 U.S.C.A. § 3731

§ 3731. Appeal by United States

Effective: November 2, 2002
Currentness

In a criminal case an appeal by the United States shall lie to a court of appeals from a decision, judgment, or order of a district court dismissing an indictment or information or granting a new trial after verdict or judgment, as to any one or more counts, or any part thereof, except that no appeal shall lie where the double jeopardy clause of the United States Constitution prohibits further prosecution.

An appeal by the United States shall lie to a court of appeals from a decision or order of a district court suppressing or excluding evidence or requiring the return of seized property in a criminal proceeding, not made after the defendant has been put in jeopardy and before the verdict or finding on an indictment or information, if the United States attorney certifies to the district court that the appeal is not taken for purpose of delay and that the evidence is a substantial proof of a fact material in the proceeding.

An appeal by the United States shall lie to a court of appeals from a decision or order, entered by a district court of the United States, granting the release of a person charged with or convicted of an offense, or denying a motion for revocation of, or modification of the conditions of, a decision or order granting release.

The appeal in all such cases shall be taken within thirty days after the decision, judgment or order has been rendered and shall be diligently prosecuted.

The provisions of this section shall be liberally construed to effectuate its purposes.

**CREDIT(S)**

(June 25, 1948, c. 645, 62 Stat. 844; May 24, 1949, c. 139, § 58, 63 Stat. 97; Pub.L. 90-351, Title VIII, § 1301, June 19, 1968, 82 Stat. 237; Pub.L. 91-644, Title III, § 14(a), Jan. 2, 1971, 84 Stat. 1890; Pub.L. 98-473, Title II, §§ 205, 1206, Oct. 12, 1984, 98 Stat. 1986, 2153; Pub.L. 99-646, § 32, Nov. 10, 1986, 100 Stat. 3598; Pub.L. 103-322, Title XXXIII, § 330008(4), Sept. 13, 1994, 108 Stat. 2142; Pub.L. 107-273, Div. B, Title III, § 3004, Nov. 2, 2002, 116 Stat. 1805.)

18 U.S.C.A. § 3731, 18 USCA § 3731
Current through P.L. 118-19. Some statute sections may be more current, see credits for details.

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

 © 2023 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
    Title 28. Judiciary and Judicial Procedure (Refs & Annos)
        Part IV. Jurisdiction and Venue (Refs & Annos)
            Chapter 83. Courts of Appeals (Refs & Annos)

28 U.S.C.A. § 1291

§ 1291. Final decisions of district courts

Currentness

The courts of appeals (other than the United States Court of Appeals for the Federal Circuit) shall have jurisdiction of appeals from all final decisions of the district courts of the United States, the United States District Court for the District of the Canal Zone, the District Court of Guam, and the District Court of the Virgin Islands, except where a direct review may be had in the Supreme Court. The jurisdiction of the United States Court of Appeals for the Federal Circuit shall be limited to the jurisdiction described in sections 1292(c) and (d) and 1295 of this title.

**CREDIT(S)**

(June 25, 1948, c. 646, 62 Stat. 929; Oct. 31, 1951, c. 655, § 48, 65 Stat. 726; Pub.L. 85-508, § 12(e), July 7, 1958, 72 Stat. 348; Pub.L. 97-164, Title I, § 124, Apr. 2, 1982, 96 Stat. 36.)

28 U.S.C.A. § 1291, 28 USCA § 1291
Current through P.L. 118-19. Some statute sections may be more current, see credits for details.

---

**End of Document**                                                        © 2023 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
   Title 28. Judiciary and Judicial Procedure (Refs & Annos)
     Part IV. Jurisdiction and Venue (Refs & Annos)
       Chapter 83. Courts of Appeals (Refs & Annos)

28 U.S.C.A. § 1292

§ 1292. Interlocutory decisions

Currentness

**(a)** Except as provided in subsections (c) and (d) of this section, the courts of appeals shall have jurisdiction of appeals from:

**(1)** Interlocutory orders of the district courts of the United States, the United States District Court for the District of the Canal Zone, the District Court of Guam, and the District Court of the Virgin Islands, or of the judges thereof, granting, continuing, modifying, refusing or dissolving injunctions, or refusing to dissolve or modify injunctions, except where a direct review may be had in the Supreme Court;

**(2)** Interlocutory orders appointing receivers, or refusing orders to wind up receiverships or to take steps to accomplish the purposes thereof, such as directing sales or other disposals of property;

**(3)** Interlocutory decrees of such district courts or the judges thereof determining the rights and liabilities of the parties to admiralty cases in which appeals from final decrees are allowed.

**(b)** When a district judge, in making in a civil action an order not otherwise appealable under this section, shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, he shall so state in writing in such order. The Court of Appeals which would have jurisdiction of an appeal of such action may thereupon, in its discretion, permit an appeal to be taken from such order, if application is made to it within ten days after the entry of the order: *Provided, however,* That application for an appeal hereunder shall not stay proceedings in the district court unless the district judge or the Court of Appeals or a judge thereof shall so order.

**(c)** The United States Court of Appeals for the Federal Circuit shall have exclusive jurisdiction--

**(1)** of an appeal from an interlocutory order or decree described in subsection (a) or (b) of this section in any case over which the court would have jurisdiction of an appeal under section 1295 of this title; and

**(2)** of an appeal from a judgment in a civil action for patent infringement which would otherwise be appealable to the United States Court of Appeals for the Federal Circuit and is final except for an accounting.

Add. 10a

**(d)(1)** When the chief judge of the Court of International Trade issues an order under the provisions of section 256(b) of this title, or when any judge of the Court of International Trade, in issuing any other interlocutory order, includes in the order a statement that a controlling question of law is involved with respect to which there is a substantial ground for difference of opinion and that an immediate appeal from that order may materially advance the ultimate termination of the litigation, the United States Court of Appeals for the Federal Circuit may, in its discretion, permit an appeal to be taken from such order, if application is made to that Court within ten days after the entry of such order.

**(2)** When the chief judge of the United States Court of Federal Claims issues an order under section 798(b) of this title, or when any judge of the United States Court of Federal Claims, in issuing an interlocutory order, includes in the order a statement that a controlling question of law is involved with respect to which there is a substantial ground for difference of opinion and that an immediate appeal from that order may materially advance the ultimate termination of the litigation, the United States Court of Appeals for the Federal Circuit may, in its discretion, permit an appeal to be taken from such order, if application is made to that Court within ten days after the entry of such order.

**(3)** Neither the application for nor the granting of an appeal under this subsection shall stay proceedings in the Court of International Trade or in the Court of Federal Claims, as the case may be, unless a stay is ordered by a judge of the Court of International Trade or of the Court of Federal Claims or by the United States Court of Appeals for the Federal Circuit or a judge of that court.

**(4)(A)** The United States Court of Appeals for the Federal Circuit shall have exclusive jurisdiction of an appeal from an interlocutory order of a district court of the United States, the District Court of Guam, the District Court of the Virgin Islands, or the District Court for the Northern Mariana Islands, granting or denying, in whole or in part, a motion to transfer an action to the United States Court of Federal Claims under section 1631 of this title.

**(B)** When a motion to transfer an action to the Court of Federal Claims is filed in a district court, no further proceedings shall be taken in the district court until 60 days after the court has ruled upon the motion. If an appeal is taken from the district court's grant or denial of the motion, proceedings shall be further stayed until the appeal has been decided by the Court of Appeals for the Federal Circuit. The stay of proceedings in the district court shall not bar the granting of preliminary or injunctive relief, where appropriate and where expedition is reasonably necessary. However, during the period in which proceedings are stayed as provided in this subparagraph, no transfer to the Court of Federal Claims pursuant to the motion shall be carried out.

**(e)** The Supreme Court may prescribe rules, in accordance with section 2072 of this title, to provide for an appeal of an interlocutory decision to the courts of appeals that is not otherwise provided for under subsection (a), (b), (c), or (d).

## CREDIT(S)

(June 25, 1948, c. 646, 62 Stat. 929; Oct. 31, 1951, c. 655, § 49, 65 Stat. 726; Pub.L. 85-508, § 12(e), July 7, 1958, 72 Stat. 348; Pub.L. 85-919, Sept. 2, 1958, 72 Stat. 1770; Pub.L. 97-164, Title I, § 125, Apr. 2, 1982, 96 Stat. 36; Pub.L. 98-620, Title IV, § 412, Nov. 8, 1984, 98 Stat. 3362; Pub.L. 100-702, Title V, § 501, Nov. 19, 1988, 102 Stat. 4652; Pub.L. 102-572, Title I, § 101, Title IX, §§ 902(b), 906(c), Oct. 29, 1992, 106 Stat. 4506, 4516, 4518.)

28 U.S.C.A. § 1292, 28 USCA § 1292
Current through P.L. 118-19. Some statute sections may be more current, see credits for details.

Add. 11a

§ 1292. Interlocutory decisions, 28 USCA § 1292

**End of Document**    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Add. 12a

United States Code Annotated
   Title 28. Judiciary and Judicial Procedure (Refs & Annos)
      Part V. Procedure
         Chapter 111. General Provisions (Refs & Annos)

28 U.S.C.A. § 1651

§ 1651. Writs

Currentness

**(a)** The Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law.

**(b)** An alternative writ or rule nisi may be issued by a justice or judge of a court which has jurisdiction.

**CREDIT(S)**

(June 25, 1948, c. 646, 62 Stat. 944; May 24, 1949, c. 139, § 90, 63 Stat. 102.)

28 U.S.C.A. § 1651, 28 USCA § 1651
Current through P.L. 118-19. Some statute sections may be more current, see credits for details.

**End of Document**
© 2023 Thomson Reuters. No claim to original U.S. Government Works.

Add. 13a